# Exhibit 2

eFiled
01/10/2024 9:04:36 AM
Superior Court
of the District of Columbia

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

### CIVIL DIVISION

| | |
|---|---|
| NATIONAL CONSUMERS LEAGUE<br>1701 K Street NW, Suite 1200<br>Washington, DC 20006, | Civil Case No. **2024-CAB-000196** |
| | **COMPLAINT WITH JURY DEMAND** |
| Plaintiff, | |
| v. | |
| STARBUCKS CORPORATION<br>2401 Utah Avenue South<br>Seattle, WA 98134<br>(206) 447-1575 | |
| For Service of Process:<br>Serve Registered Agent for WA:<br>300 Deschutes Way SW Suite 208<br>MC-CSC1 Tumwater, WA 98501, | |
| Defendant. | |

Plaintiff National Consumers League ("Plaintiff" or "NCL") brings this action, on behalf of itself and the general public, against Defendant Starbucks Corporation ("Defendant" or "Starbucks"). Plaintiff, by and through its attorneys, alleges the following:

### INTRODUCTION

1. Plaintiff brings this action to end Starbucks' unfair and deceptive trade practice of misrepresenting to consumers that it is "committed to 100% ethical coffee sourcing" and to "100% ethically sourced tea" when in reality Starbucks does not ethically source its coffee beans or tea leaves. Instead, Starbucks sources coffee beans and tea leaves from cooperatives and farms that have committed documented, severe human rights and labor abuses, including the use of child labor and forced labor as well as rampant and egregious sexual harassment and assault.

2. Starbucks knows that there is significant and growing consumer demand for ethically sourced goods and services, and that ethically sourced goods command a price premium in the market. Despite the documented human rights and labor abuses in its supply chain, Starbucks has sought to capitalize on this growing consumer demand by misleadingly branding

itself as a company whose "commitment to fundamental human rights" is at its "core," and by falsely assuring consumers that Starbucks coffee and tea products are ethically sourced.

3.      Not only does Starbucks promote its supposed commitment to ethical sourcing throughout its website and social media, but Starbucks also prominently displays that it is "Committed to 100% Ethical Coffee Sourcing" on the front of every retail bag of coffee beans and every box of K-Cup coffee pods it sells throughout the country.

4.      Contrary to Starbucks' ethical sourcing representations, governmental investigators and journalists have repeatedly uncovered egregious forms of worker exploitation occurring on farms supplying to Starbucks and/or "certified" by Starbucks as "ethical."

5.      For example, last year the Brazilian labor prosecutor issued a complaint against Starbucks' largest Brazilian supplier, the Cooxupé cooperative, citing abusive and unsafe working conditions analogous to slavery, yet Starbucks continues to source from Cooxupé.

6.      Similarly, investigative journalists have uncovered extreme forms of worker exploitation and violence at farms supplying tea to Starbucks. For example, undercover BBC reporters recently exposed rampant gender-based violence and sexual harassment at a Starbucks supplier, the James Finlay & Co. tea plantation in Kenya, where women reported being forced to engage in sexual acts in exchange for work.

7.      Rather than take meaningful action to address the publicly known labor and human rights violations in its international supply chains, as consumers would expect from a company that professes "commitment to 100% ethical[] sourc[ing]," Starbucks has instead turned a blind eye and continued to point to so-called ethical "certification" programs that are known to be unreliable as the basis for its representations that its coffee and tea products are ethically sourced.

8.      Consumers have been misled by Starbucks' deceptive advertising, and Starbucks, with annual profits exceeding $21 billion, has unjustly benefited from branding itself as an industry leader in corporate responsibility while hiding the true nature of its unreliable and inadequate sourcing practices.

9.     On behalf of itself and the general public, Plaintiff therefore brings this action for violations of the District of Columbia's Consumer Protection Procedures Act ("CPPA"), D.C. Code §§ 28-3901 *et seq.*, seeking declaratory and injunctive relief, damages, including treble and/or statutory damages, attorneys' fees and costs, and any other relief the Court deems just and appropriate.

<div align="center">

**PARTIES**

</div>

10.     Plaintiff NCL is a § 501(c)(3) non-profit, public-interest, membership organization founded in 1899 and dedicated to consumer protection, including efforts to encourage and promote accurate labeling on food and beverage products. Plaintiff is located at 1701 K Street N.W., Suite 1200, Washington, D.C. 20006. Plaintiff has purchased Starbucks coffee and tea products. Plaintiff brings this action on behalf of itself and the interests of the general public pursuant to D.C. Code § 28-3905(k)(1).

11.     A central part of Plaintiff's work is to hold companies accountable for the claims they make on food products. In support of this central organizational mission, Plaintiff NCL has historically pursued advocacy before state and federal agencies and legislators, educational outreach to the public, and litigation to promote and encourage reliable and accurate product labeling for consumers.

12.     NCL has also advocated on behalf of workers' rights from its earliest days, including by playing a role in establishing the eight-hour workday, child labor laws, and the minimum wage. NCL continues to promote safety and fairness across all employment sectors and to fight to protect and improve workers' rights.

13.     Further, NCL champions corporate social responsibility initiatives and has previously commissioned a survey demonstrating the importance of workers' rights to consumer preferences.

14.     Plaintiff NCL has a sufficient nexus to adequately represent the interests of D.C. consumers of Starbucks coffee and tea. It has a history of litigating for consumers in D.C. courts to prosecute false advertising on food and beverage products such as bread, baby formula, spices,

and packaged cereal. It also has a history of challenging retailers in D.C. courts for "bluewashing," or marketing with false claims of corporate social responsibility.

15.     Defendant Starbucks is a Washington corporation with its principal place of business in Seattle, Washington. Starbucks is one of the largest coffee house chains and coffee manufacturers in the world and also sells a line of tea, branded as Teavana. Starbucks sells and uniformly markets its products for sale throughout the country, including in Washington, D.C.

16.     Starbucks is a "person" and a "merchant" that provides "goods" within the meaning of the CPPA. *See id.* § 28-3901(a)(1), (3), (7).

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this matter. District of Columbia superior courts have subject-matter jurisdiction over CPPA actions such as this one pursuant to D.C. Code §§ 28-3901 *et seq*.

18.     Plaintiff NCL performs its work throughout the United States, including the District of Columbia. Plaintiff is registered as a nonprofit in the District of Columbia, and members of Plaintiff's staff reside and work in or near the District.

19.     This Court has personal jurisdiction over Starbucks because Starbucks has purposefully directed its conduct to the District and has availed itself of the benefits and protections of District of Columbia law, including by marketing, distributing, and selling its coffee and tea products to consumers in the District of Columbia.

20.     Venue is proper in this Court because Starbucks aims marketing and advertising material at consumers within the District. Starbucks' internet advertising is accessible in the District. Starbucks sells products bearing the challenged labeling in the District, and such products are purchased by consumers in the District.

## FACTUAL ALLEGATIONS

**I.      Consumers Care About Ethical Sourcing and Are Willing to Pay a Premium for Ethically Sourced Products.**

21.     Consumers today are sensitive to the human cost behind the products they buy and care deeply about the kind of labor practices present in supply chains.

22.    According to one national survey, 60% of consumers would stop using a product if they knew that human trafficking or forced labor was used to create it.[1]

23.    Another national study found that 77% of U.S. consumers are motivated to purchase products from companies committed to making the world a better place. Nearly 80% of consumers surveyed further stated that paying employees fair wages is the first step in carrying out such a commitment.[2]

24.    A different national survey the same year collected similar reports from American consumers, finding that 70% want to know what brands are doing to address social and environmental issues. Forty-six percent (including a majority of millennials) in this survey reported that they pay close attention to a company's efforts at social responsibility before they make a purchase.[3]

25.    A 2022 market study reports that the importance of corporate social responsibility to consumers has grown such that over a quarter would pay a 10% price premium for products that make certain social responsibility promises, including that they support local economies.[4]

26.    A recent McKinsey & Co. study analyzing U.S. sales data from 2017 to June 2022 bears out the effects of such growing consumer preference for responsibly produced goods. The McKinsey study found that products with corporate responsibility advertising achieved disproportionate growth in sales compared to analogous products that were marketed without corporate responsibility claims. Put another way, McKinsey determined that products advertised as responsibly produced saw a greater growth in sales than those that were not. Products that the

---

[1] Stephen DeAngelis, *Even If Consumers Aren't Aware of Human Trafficking, Companies Need to Be*, ENTERRA SOLUTIONS (Mar. 6, 2020), https://enterrasolutions.com/blog/even-if-consumers-arent-aware-of-human-trafficking-companies-need-to-be/.

[2] *2019 Aflac CSR Survey*, AFLAC (July 2019), https://www.aflac.com/docs/about-aflac/csr-survey-assets/2019-aflac-csr-infographic-and-survey.pdf.

[3] *Consumers Expect the Brands They Support to Be Socially Responsible*, CERTUS INSIGHTS (Sept. 2019), https://certusinsights.com/wp-content/uploads/2019/10/Markstein-Social-Responsibility-_-Certus-Insights-Research-_.pdf.

[4] *Consumer Trends 2022: Corporate Social Responsibility and Consumer Activism*, LEGER (Feb. 1, 2022), https://blog.legerusa.com/consumer-trends-2022-consumer-activism.

McKinsey study found enjoyed the corporate-responsibility sales bump included packaged coffee.[5]

27.     Similarly, an earlier study led by researchers at Harvard University studied consumer willingness to pay a premium for ethically sourced coffee that is produced without the use of forced or child labor. The Harvard study found that consumers were willing to pay an average of 23% more for coffee certified as ethically produced.[6]

## II.   To Satisfy and Capitalize on Consumer Demand for Ethically Sourced Products, Starbucks Actively Markets and Brands Itself as Committed to Global Human Rights and "Ethical Sourcing."

28.     Starbucks is no doubt aware of the consumer demand for ethically sourced products free of the use of child or forced labor, gender-based violence, and other labor and human rights violations, as well as the market price premium that ethically sourced products command.

29.     To satisfy and capitalize on this growing consumer demand for ethically sourced products, Starbucks has launched a wide-ranging campaign to brand and market itself not only as a responsible, socially conscious company, but as a leader in the field of ethical coffee and tea sourcing that is "committed to 100% ethical" sourcing of these products.

30.     Targeting consumers concerned about corporate social impact, Starbucks advertises that a "global commitment to fundamental human rights" is "a core component of the way" the company does business.[7] In this vein, Starbucks publicizes its "Global Human Rights Statement," which promises consumers that Starbucks "respect[s] the human rights of individuals and communities impacted by [its] operations and products, and . . . commit[s] to respect the principles of the: UN Guiding principles on Business and Human Rights; UN Global Compact; OECD Guidelines for Multinational Enterprises; International Bill of Rights; ILO

---

[5] *Consumers Care About Sustainability—And Back it up with Their Wallets*, McKinsey & Co. (Feb. 6, 2023), https://www.mckinsey.com/industries/consumer-packaged-goods/our-insights/consumers-care-about-sustainability-and-back-it-up-with-their-wallets.
[6] Michael J. Hiscox, Michael Broukhim & Claire S. Litwin, *Consumer Demand for Fair Trade: New Evidence from a Field Experiment Using eBay Auctions of Fresh Roasted Coffee* (Mar. 16, 2011), https://scholar.harvard.edu/sites/scholar.harvard.edu/files/hiscox/files/consumer_demand_fair_trade.pdf.
[7] *See Global Human Rights Statement*, Starbucks Stories & News (Nov. 17, 2020), stories.starbucks.com/press/2020/global-human-rights-statement/.

Core Labor Standards; Women's Empowerment Principles; Children's Rights and Business Principles[;] and Framework Principles on Human Rights and the Environment."[8]

31.    Starbucks represents not only that it is committed to global human rights generally but moreover that it is "a leader in ethical sourcing."[9]

32.    Indeed, Starbucks advertises that it developed its own set of "ethical sourcing" verification standards for coffee, called "Coffee and Farmer Equity (C.A.F.E.) Practices," which Starbucks proclaims is "designed to promote transparent, profitable and sustainable coffee growing practices while also protecting the well-being of coffee farmers and workers, their families and their communities."[10]

33.    Similarly, Starbucks professes its commitment to sourcing from farms certified by the third-party supply-chain verifier Rainforest Alliance as a fundamental aspect of its broader commitment to an "ethical sourcing standard" for its tea.[11]

34.    Starbucks claims that its purported commitments to ethical sourcing *operationalize* its broader commitment to global human rights. For example, Starbucks advertises that its use of "ethical sourcing programs integrate[s] respect for human rights throughout" its supply chain by setting standards and implementing procedures that protect "rights such as: . . . the right to be free from forced and child labor" and "the right to just and favorable working conditions, including ensuring the health and safety of workers."[12]

35.    A "zero-tolerance policy" for noncompliance with minimum-wage laws and the use of forced or child labor is among the human-rights protective procedures that Starbucks advertises is part of its C.A.F.E. Practices ethical sourcing program. In its publicly available "Starbucks Global Academy" web materials, Starbucks teaches customers that coffee "[f]arms that fail to meet the zero-tolerance indicators [compliance with minimum wage law and absence

---

[8] *Id.*

[9] *Coffee Academy*, STARBUCKS GLOBAL ACADEMY, https://starbucksglobalacademy.com/coffee-academy/ (last visited Dec. 19, 2023).

[10] *Coffee*, STARBUCKS, https://www.starbucks.com/responsibility/sourcing/coffee/ (last visited Nov. 6, 2023).

[11] *See Tea*, STARBUCKS, https://www.starbucks.com/responsibility/sourcing/tea/ (last visited Nov. 6, 2023).

[12] *See Global Human Rights Statement*, *supra* note 7.

of forced or child labor] are not allowed to participate in the program until corrective action is taken and correction is confirmed."[13]

36.　Starbucks claims that, in this way, it "protect[s] the well-being of coffee farmers and workers, their families and their communities"[14] and is "focused on improving the livelihoods of tea workers, smallholder farmers and their communities" within its supply chain.[15]

37.　Throughout its web, print and other advertising, Starbucks further claims that its ethical sourcing programs are essential to its business model because "[h]elping people thrive helps ensure the long-term sustainability" of its "premium products."

38.　Starbucks purposefully takes steps to ensure that every Starbucks consumer is aware of its professed commitment to global human rights and to 100% ethical sourcing, and to cultivate in consumers a sense of trust that when they purchase Starbucks products, they are supporting the rights and wellbeing of workers throughout Starbucks' supply chain.

39.　For example, in its stores, Starbucks has at times prominently displayed a placard near the cash register that assures customers that when they buy coffee, "they help grow a community" because their purchase helps Starbucks "invest in [worker] well being."

40.　Starbucks additionally assures consumers of its purported status as a leader in ethical sourcing by prominently marketing its commitment to "100% ethical coffee sourcing" on every retail bag of Starbucks coffee beans it sells throughout the country.

---

[13] Module 5.9 – Social Responsibility, at https://starbucksglobalacademy.com/explore/ (select Coffee Academy 300).
[14] *Coffee*, *supra* note 10.
[15] *Tea*, *supra* note 11.

41.     The front of every bag of coffee beans that Starbucks sells in its own stores includes this image of a seal that proclaims, "Committed to 100% Ethical Coffee Sourcing":



42.     Starbucks has taken special efforts, particularly during the most recent holiday shopping season, to reinforce to its customers that the seal means Starbucks coffee is ethically sourced. For example, as part of its annual "Starbucks for Life" holiday promotional contest in 2023, Starbucks offered its "Starbucks Rewards" members an opportunity to win prizes by watching and then answering questions about a video specifically discussing the seal and C.A.F.E. Practices. The video was narrated by a Starbucks spokesperson who introduced himself as a "green coffee buyer at Starbucks." After a shot zooming in on an image of the seal, the spokesperson declared that Starbucks' "ethical sourcing stamp … [is] a lot more than just a stamp. It means that we are buying coffee, making sure that it's good for the planet and good for the people who produce it." He went on to assert that "we *know* that our coffee is ethically sourced" because "we've developed rigorous ethical sourcing guidelines . . . verified by third party scientific certification systems," and he further claimed that Starbucks' coffee supply chain

"is traceable and transparent." He again assured consumers that when he drinks Starbucks coffee, "I *know* it was ethically sourced." (Emphasis added.) After watching this video extolling Starbucks' ethical sourcing practices, customers were asked to parrot back its content as answers to quiz questions about the seal's meaning and C.A.F.E. Practices, in exchange for a chance to win various Starbucks prizes. The video is also posted on Starbucks' website as part of its "Coffee Academy."[16]

43.     The front of every bag of coffee beans that Starbucks sells via third-party retailers, such as Target, Walgreens, Safeway, and CVS, contains the same phrase, "Committed to 100% Ethical Coffee Sourcing," which is included on the seal:



---

[16] https://starbucksglobalacademy.com/coffee-academy/ongoing-learning/ (select "Committed to 100% Ethical Coffee Sourcing (2:18)" from the video library).

44.   Other Starbucks coffee products sold at third-party retailers display the same phrase, "Committed to 100% Ethical Coffee Sourcing":




45.   The same phrase, "Committed to 100% Ethical Coffee Sourcing," is also on the front of every bag of coffee beans Starbucks sells via its website:




46.     Starbucks features the same phrase, "Committed to 100% Ethical Coffee Sourcing," on the front of every box of K-Cup coffee pods that it sells on its website and via third-party retailers:





47.     With respect to tea, Starbucks represents on its website that it is committed to achieving the goal of "100% ethically sourced tea by 2020."

48.     Starbucks makes further representations about the ways that it is "committed to ethically sourced tea" in descriptions of its Teavana branded tea products on the websites of third-party retailers like Pavilion's, Tom Thumb, Amazon, Jewel-Osco, Randall's, and Star Market. In these descriptions it proclaims that it "support[s] tea-growing communities and responsible farming practices around the globe" and that it has worked over ten years "to ensure our tea products are produced . . . under safe, transparent and humane working conditions."

49.     Starbucks also represents on various social media websites that it has an ethical supply chain, including stating that it has "no business relationships with suppliers that use forced labor" and that C.A.F.E. practices *ensure[s]* that [Starbucks] is ethically sourcing [its] coffee" (emphasis added):





50.     In short, Starbucks holds itself out as a company that takes responsibility for its supply chain as part of its commitment to global human rights, and it represents that its ethical sourcing programs deliver on these human rights commitments and in fact empower communities within its supply chains.

III.     **Starbucks' Ethical Sourcing Representations Are Misleading Because Starbucks in Fact Sources Coffee and Tea from Cooperatives and Farms that Engage in Labor Exploitation and Gender-Based Violence.**

51.     Reasonable consumers would not expect a company that is "committed to 100% ethical sourcing" in its coffee and tea to have multiple instances of forced or child labor and workplaces with rampant gender-based violence in its coffee and tea supply chains.

52.     Starbucks' repeated representations to consumers that it is committed to 100% ethical sourcing are thus misleading because in reality Starbucks both certifies as Starbucks-approved sources and actually sources coffee beans from farms and cooperatives that engage in forced and child labor and other egregious labor and human rights violations. Starbucks' representations are also misleading because Starbucks sources tea leaves from tea farms that engage in labor violations and extreme forms of sexual harassment and gender-based violence.

53.     Just last year, the Brazilian labor prosecutor, an independent public enforcer of the state's labor laws, issued a complaint against the largest supplier of Starbucks in Brazil, the C.A.F.E. Practices-certified Cooxupé cooperative, which includes over 2000 farms and accounts for 40% of Starbucks' Brazilian coffee supply. The labor prosecutor's complaint cites abusive and unsafe working conditions analogous to slavery, including physical and psychological violence and confinement. As part of the investigation related to this complaint, the Brazilian government has cited several Cooxupé farms for requiring workers to carry coffee sacks of over 100 pounds on their backs and work excessive hours. And a related investigation focused on tips that the cooperative illegally trafficked more than thirty migrant workers from the state of Bahia in northeastern Brazil to supply forced labor and construct a silo for the cooperative. The president of Cooxupé, Carlos Augusto Rodrigues de Melo, has separately been cited, as recently as July 2021, for his family farm's callous theft of 30% of its workers' wages. Nevertheless, Starbucks continues to source from Cooxupé, and the cooperative remains C.A.F.E. Practices certified.

54.     Further, in May of this year, investigative journalists reported that workers at Piedade Farm, a C.A.F.E. Practices-certified Starbucks coffee supplier, had similarly been

subject to extreme wage theft. In the previous harvest, workers at Piedade had been forced to pay more than a third of their wages from harvesting back to the farm, ostensibly to cover the cost of the machinery necessary to harvest coffee beans. This was a blatant violation of Brazilian law, which requires agricultural employers to provide all equipment necessary for harvest, in good condition and free of charge to their employees.[17]

55.     Similarly, in the case of tea, in February 2023, undercover BBC reporters exposed rampant gender-based violence and sexual harassment at the James Finlay & Co. tea plantation in Kenya, which supplied to Starbucks at the time. Women working on the plantation reported being forced by their supervisors into having sex in exchange for work. As one female worker explained, "It is just torture; he wants to sleep with you, then you get a job."[18] Consistent with these worker reports, a recruiter for the company who had worked on its plantations for over 30 years was caught on video pressuring an undercover reporter during a job interview for sex in exchange for work. The video shows him pinning the undercover reporter against a window and asking her to touch him and undress: "I have helped you, help me. … We'll lie down, finish and go. Then you come and work."[19] Workers reported that the mechanisms for reporting abuses at the plantation did not work, and they did not know about any reporting channels available through the plantation's buyers, such as Starbucks.

56.     A group of 2500 to 3000 workers at this same Finlay tea plantation has also filed a class action against Finlay in Scotland (where Finlay is based) alleging that the grueling labor conditions to which they were subjected on the plantation, including years of pulling a heavy tea-plucking machine weighing over 26 pounds without adequate healthcare or other resources to address the bodily stress of the work, caused them to suffer debilitating musculoskeletal

---

[17] Poliana Dallabrida, *Starbucks Supplier Farm Ignores Law and Fails to Provide Coffee Harvesting Machine, Workers Say*, REPÓRTER BRASIL (May 15, 2023), https://reporterbrasil.org.br/2023/05/starbucks-supplier-farm-ignores-law-and-fails-to-provide-coffee-harvesting-machine-workers-say/.

[18] Africa Eye and Panorama Teams, *True Cost of our Tea: Sexual Abuse on Kenyan Tea Farms Revealed*, BBC (Feb. 20, 2023), https://www.bbc.com/news/uk-64662056.

[19] *Id.*

injuries.[20] These workers have reported that plantation management would simply fire employees who became chronically injured due to the harsh conditions and that the company deprives workers of adequate healthcare, allowing them to seek healthcare only from company clinics on the estate that merely provide workers painkillers and tell them to go back to work, and terminating employees when they have sought healthcare from other providers.

57.     In January 2022, Scotland's *Herald* reported that tea pickers at this plantation were paid the equivalent of only 25 British pounds (approximately $30 U.S.) a week for their arduous work, which they performed up to twelve hours a day, six days a week.

### a.   Labor Exploitation and Gender-Based Violence Are Not Ethical Sourcing Practices, Even If the Farm Has Been Certified as "Ethical."

58.     There can be no dispute that sourcing from farms employing slave-like labor conditions and sexual abuse is antithetical to a "commit[ment] to 100% ethical" sourcing. The practices uncovered at Starbucks-supplying and Starbucks-certified farms violate multiple international human rights norms and standards, including but not limited to the UN Guiding principles on Business and Human Rights, UN Global Compact, OECD Guidelines for Multinational Enterprises, International Bill of Rights, ILO Core Labor Standards, Women's Empowerment Principles, Children's Rights and Business Principles, and Framework Principles on Human Rights and the Environment.

59.     Even if Starbucks purchases 100% of its coffee products from C.A.F.E. Practices-certified coffee farms and 100% of its tea products from tea farms certified by the Rainforest Alliance, this does not render its representations that it is committed to 100% ethical sourcing truthful or non-misleading to consumers. Both C.A.F.E. Practices and Rainforest Alliance have long and well documented histories of providing their stamp of approval to farms engaged in egregious labor and human rights violations, and multiple third-party experts and investigators have levied critiques of these programs' inadequate auditing and verification systems, which

---

[20] The suit was first filed in 2018. *See* Dominic Kirui, *In a Landmark Case, Kenyan Tea Workers Continue to Fight for Damages from a Scottish Tea Giant over Musculoskeletal Injuries*, EQUAL TIMES (Apr. 28, 2023), https://www.equaltimes.org/in-a-landmark-case-kenyan-tea?lang=en.

have failed to detect or correct such violations, and deficient standards, which do not impose the requirements necessary to deliver on the human rights principles Starbucks purports to respect.

60.     Indeed, the labor abuses and gender-based violence described in paragraphs 53-57 *supra*, occurred at *coffee and tea suppliers certified by C.A.F.E. Practices and/or Rainforest Alliance*.

61.     Contrary to Starbucks' misrepresentations, a rubber-stamp "certification" from these programs does not establish that Starbucks' coffee and tea are in fact ethically sourced or in conformance with the international human rights norms and standards that Starbucks purports to respect.

62.     Given the longstanding and well documented failings of Starbucks' so-called "ethical" coffee and tea sourcing, Starbucks knows or should know that its advertised "commitment to 100% ethical" coffee and tea sourcing is inaccurate and misleading.

<u>Labor Abuses Detected at C.A.F.E. Practices-Certified Coffee Farms</u>

63.     For nearly ten years, investigations by government officials and journalists in major coffee growing regions have uncovered numerous labor and human rights violations on coffee farms that have been certified by Starbucks' own monitoring program.

64.     In Brazil, the world's largest coffee producer and exporter,[21] pervasive labor irregularities and abuses, including forced and child labor, have repeatedly been discovered on coffee farms certified by Starbucks' C.A.F.E. Practices program.

65.     For example, in summer 2015, Brazilian labor inspectors cited at least two C.A.F.E. Practices-certified farms for labor violations, including unsafe working conditions due to improper storage and use of pesticides near workers' eating areas and residences and failure to provide legally required benefits. These farms had been "verified" by C.A.F.E. Practices and their certification renewed earlier that same year the violations were uncovered.

66.     In summer 2018, Brazilian labor inspectors rescued approximately 24 workers from slavery-like conditions at two different C.A.F.E. Practices-certified farms known as

---

[21] Poliana Dallabrida, André Campos & Elaine Almeida, *Certified Coffee, Rightless Workers 2*, MONITOR (Marcel Gomes ed., Repórter Brasil June 2021), https://reporterbrasil.org.br/wp-content/uploads/2021/06/Monitor-Caf%C3%A9-2021-EN-final.pdf, at 4.

"Fartura" and "Cedro II," from which, on information and belief, Starbucks was sourcing coffee beans.

67.     The workers rescued in the raid at Fartura had reportedly been housed in group lodging with hazardous sanitation and no drinking water. Along with numerous instances of blatant wage theft, the workers also reported frequently finding dead bats in the coverless water tanks they were forced to use for cooking and drinking. Fartura had been C.A.F.E. Practices-certified since 2016.

68.     At Cedro II, the rescued workers, who included a seventeen-year-old, also suffered substandard, unsanitary housing, and some were forced to work 17-hour shifts, from 6am to 11pm. Following the 2018 raid, Starbucks did not revoke Cedro II's C.A.F.E. Practices certification but instead allowed it to maintain its status as C.A.F.E. Practices-certified. It was only after the Brazilian government in April 2019 placed Cedro II on its "Dirty List," which identifies employers violating the country's law against "modern slavery," that Starbucks finally announced it would stop sourcing from the farm.

69.     In August 2022, seventeen workers were rescued from slavery-like conditions at the Mesas Farm, a coffee plantation that had been awarded a C.A.F.E. Practices certification just one month prior. The workers rescued included a fifteen-year-old, a sixteen-year-old, and a seventeen-year-old, who were engaged in outdoor work, unprotected from the elements, that involved manipulating heavy loads, such as coffee sacks weighing over 130 pounds. Such blatant human rights affronts, plainly violating the norms set forth in, among other things, the Children's Rights and Business Principles that Starbucks professes to respect, occurred alongside numerous other labor violations. For example, the Mesas Farm did not provide legally required personal protective equipment to the workers, nor did it memorialize their work agreement in a formal contract as required by Brazilian law. Nevertheless, during the period this worker exploitation was observed by investigators, Starbucks maintained the Mesas Farm "in active status" within

the C.A.F.E. Practices program. On information and belief, Starbucks has not revoked that status.[22]

70.     In 2022, C.A.F.E. Practices-certified Bernardes Estate Coffee, comprising over 439 acres of coffee plantations, was charged with sixteen labor violations by the Brazilian labor department for various offenses, including failure to keep records of employee wages, provide legally required trainings regarding health and safety procedures, and store pesticides safely. These citations followed nine that were issued in 2019 for failing to provide workers free of charge with first-aid material, toilet paper, or adequate showers, dining space, and drinking water. Investigation of the coffee producer this year confirmed that the same problems cited in previous years persist, and workers reported that they were improperly made to pay for transportation to and lodging at the worksite. Yet, on information and belief, Bernardes Estate continues to bear C.A.F.E. Practices certification.[23]

71.     Starbucks' failure to promptly revoke the C.A.F.E. Practices certification for each of the farms described in paragraphs 67-70, *supra*, and suspend them from its ethical sourcing program directly contradicts its misrepresentation to consumers about C.A.F.E. Practices' "zero tolerance" procedures for noncompliance with minimum wage law or the use of forced or child labor.

72.     These instances of worker abuse and exploitation in Brazil were uncovered during a period of steady reductions in the Brazilian government's labor enforcement budget and enforcement capacity.[24] Other examples of worker exploitation on C.A.F.E. Practices-certified coffee farms almost certainly occurred but went undetected.

73.     The inadequacies of Starbucks' coffee certification program have been observed outside Brazil as well. For example, a 2020 report from the United Kingdom's Channel 4

---

[22] *See* Hélen Freitas & Poliana Dallabrida, *Behind Starbucks Coffee: Brazil's Seasonal Harvest Labourers Report Routine of Low Wages, Cold Food and Even Slave Labour on Farms that Supply the World's Most Famous Coffee Shop Chain*, REPÓRTER BRASIL (Naira Hofmeister ed., Oct. 2023), https://reporterbrasil.org.br/wp-content/uploads/2023/11/monitor_starbucks_coffee_slave_labor_ENG.pdf, at 11-12.
[23] *See id.* at 14-15.
[24] *See* Dallabrida, Campos & Almeida, *supra* note 21, at 13.

*Dispatches* program documented children under thirteen working 40- to 50-hour weeks on five different C.A.F.E. Practices certified coffee farms in Guatemala, where coffee is the second-most important agricultural export after sugar. The Guatemalan farms identified in the *Dispatches* exposé had been "verified" by Starbucks' C.A.F.E. Practices program in 2019, the same year that the *Dispatches* investigators uncovered and filmed the widespread child labor.

74.     The large number of labor violations detected at C.A.F.E. Practices-certified farms is unsurprising given the C.A.F.E. Practices' certification and verification program's inherent design flaws.

75.     For one, Starbucks' C.A.F.E. Practices program allows inspections to occur as infrequently as every two or three years, but even annual inspections are recognized as inadequate to ensure that workers on plantations and large farms are protected.[25]

76.     Additionally, C.A.F.E. Practices verification or re-verification audits, even those categorized as "unannounced" because they are selected by semi-random sampling, are communicated to coffee producers 24-48 hours in advance, allowing coffee farm employers to hide evidence of labor violations during the audit, which lasts only half a day per farm.[26]

77.     Indeed, because the C.A.F.E. Practices audit/verification process occurs only on the inspected farm and does not involve off-site interviews with workers, their regional union, or the Brazilian labor department, C.A.F.E. Practices inspectors do not access the information sources most likely to provide relevant information about workplace practices.[27]

78.     Moreover, C.A.F.E. Practices inspections are carried out by a third-party verifier that is paid for its services by the inspected farm; this creates an inherent conflict of interest that incentivizes satisfactory verification reports even when a coffee grower is not meeting C.A.F.E. Practices standards.

---

[25] Kerstin Lindgren, *Justice in the Fields: A Report on the Role of Farmworker Justice Certification and an Evaluation of the Effectiveness of Seven Labels*, FAIR WORLD PROJECT, https://fairworldproject.org/wp-content/uploads/2016/10/Justice-In-The-Fields-Report.pdf (last visited Nov. 29, 2023), at 16.
[26] *See* Freitas & Dallabrida, *supra* note 22, at 8, 17.
[27] *See id.*

79.     C.A.F.E. Practices only requires that certified suppliers pay workers at least the minimum wage legally required in the supplier's country. In most instances, including in Brazil, such a standard does not even ensure a living wage. Thus, contrary to the recommendation of the UN Global Compact—the principles of which Starbucks promises to respect in its Global Human Rights Statement—Starbucks' C.A.F.E. Practices do *not* promote or provide a living wage.[28]

80.     Finally, Starbucks does not make publicly available a list of the coffee suppliers that bear the C.A.F.E. Practices certification or information about when, if ever, it has purchased from them.[29] Nor does Starbucks publish the results of C.A.F.E. Practices verification inspections. Without such transparency, Starbucks avoids real accountability for human rights violations in its supply chain.

81.     These and many other deficiencies in Starbucks' C.A.F.E. Practices coffee sourcing program make it an unreliable and misleading indicator of whether coffee beans are ethically sourced. Indeed, several C.A.F.E. Practices-certified farms have been cited for labor violations even in the same year they were "verified" as adhering to C.A.F.E. Practices ethical standards, illustrating the ineffectiveness and unreliability of the C.A.F.E. Practices certification process.

82.     Starbucks' reliance on the wholly inadequate C.A.F.E. Practices program is particularly egregious given the prevalence of child labor in the coffee regions from which it sources. According to the U.S. Department of Labor's Bureau of International Labor Affairs, child labor is present in the coffee industry in fourteen of the countries from which Starbucks sources.[30] In light of this publicly documented reality, Starbucks' failure to implement an effective and reliable ethical sourcing program represents an even more glaring abdication of the duties to prevent forced and child labor that it purports to respect.

---

[28] *See* Dallabrida, Campos & Almeida, *supra* note 21, at 16, 27; Lindgren, *supra* note 25, at 9.

[29] *See* Freitas & Dallabrida, *supra* note 22, at 7 (no public list of C.A.F.E. Practices-certified farms).

[30] *See List of Goods Produced by Child Labor or Forced Labor*, USDOL, U.S. BUREAU OF INTERNATIONAL LABOR AFFAIRS (Sept. 28, 2022), https://www.dol.gov/agencies/ilab/reports/child-labor/list-of-goods.

Labor Abuses Detected at Rainforest Alliance-Certified Tea Farms

83.     Like C.A.F.E. Practices certification, Rainforest Alliance certification is not a reliable indicator that products have been ethically sourced. Rather, Rainforest Alliance certification is consistently borne by tea suppliers that commit serious labor abuses.

84.     Grave deficiencies in Rainforest Alliance certification's ability to ensure the ethical sourcing of tea products have also been consistently documented for over ten years.

85.     As early as 2011, the Dutch public benefit organization and research institute Centre for Research on Multinational Corporations ("SOMO") reported on endemic labor violations at several Kenyan and Indian tea plantations certified by Rainforest Alliance.[31]

86.     In 2015, a joint investigation of working conditions at Rainforest Alliance-certified tea plantations in Assam, India by Radio 4's File and BBC News revealed that workers there experienced "dangerous and degrading living and working conditions" despite their workplaces' Rainforest Alliance certifications.[32]

87.     The Rainforest Alliance certification program suffers serious design and methodological flaws that fatally undermine its ability to ensure its certified tea products are ethically sourced.

88.     First, by its own design, Rainforest Alliance does not hold tea suppliers accountable to its standards. Its "assess-and-address" framework, adopted in 2021, permits farms committing human rights abuses such as the use of child labor, forced labor, discrimination, and workplace violence and harassment to maintain certification.[33]

89.     Second, Rainforest Alliance audits do not require the presence of a worker representative during audit interviews, which compromises the auditor's ability to uncover labor rights abuses.

---

[31] *See* Sanne van der Wal, *Certified Unilever Tea: Small Cup, Big Difference?*, SOMO (Oct. 1, 2011), https://www.somo.nl/certified-unilever-tea/. SOMO is an acronym for a Dutch phrase that translates into English as "Centre for Research on Multinational Corporations." *See id.*

[32] Justin Rowlatt & Jane Deith, *The Bitter Story Behind the UK's National Drink*, BBC (Sept. 8, 2015), https://www.bbc.com/news/world-asia-india-34173532.

[33] *What's in our 2020 Certification Program? Assess-and-Address*, Rainforest Alliance (June 2020), https://www.rainforest-alliance.org/wp-content/uploads/2020/06/2020-program-assess-address.pdf.

90.     These, along with other program design flaws, prevent the Rainforest Alliance certification program from serving as a reliable indicator of ethical sourcing.

91.     A reasonable consumer would not expect a company professing to be "committed to 100% ethical sourcing," to rely on certification programs that are wildly unreliable and woefully inadequate to safeguard against the presence of child and forced labor and other human rights violations, as Starbucks does with respect to C.A.F.E. Practices and its coffee supply chain and Rainforest Alliance and its tea supply chain.

92.     Starbucks' representations that it is "committed to 100% ethical sourcing" and that its coffee and tea are ethically sourced because they are sourced from C.A.F.E. Practices or Rainforest Alliance certified farms are thus deceptive and misleading to reasonable consumers.

**b. Despite Repeated Calls to Improve its Sourcing Practices, Starbucks Has Not Taken Meaningful Action.**

93.     Coffee industry observers have been calling on Starbucks to live up to its ethical sourcing claims for nearly a decade, yet Starbucks has not responded with any meaningful action.

94.     In 2016, Repórter Brasil, a non-governmental organization that produces investigative journalism regarding labor issues in Brazil, published the report "Certified Coffee, Rightless Workers,"[34] which detailed the widespread failure of coffee certification systems, including Starbucks' C.A.F.E. Practices, to protect Brazilian coffee workers. The report urged Starbucks and others to make changes to their certification programs, including implementation of more worker protective standards and more effective monitoring and enforcement, that would help those programs better protect workers.

95.     Similarly, the investigators who uncovered child labor on Guatemalan C.A.F.E. Practices-certified farms called on Starbucks and other large coffee buyers and certifiers to implement more robust worker pay requirements as part of their ethical sourcing standards.[35]

---

[34] *See* André Campos, *Certified Coffee, Rightless Workers*, MONITOR (Marcel Gomes ed., Repórter Brasil Dec. 2016), https://reporterbrasil.org.br/wp-content/uploads/2016/12/Cafe%CC%81_ING_Web.pdf.
[35] *See* Jamie Doward, *Children as Young as Eight Picked Coffee Beans on Farms Supplying Starbucks*, THE GUARDIAN (Mar. 1, 2020), https://www.theguardian.com/business/2020/mar/01/children-work-for-pittance-to-pick-coffee-beans-used-by-starbucks-and-nespresso.

96.     However, Starbucks has not taken meaningful action to address the gross deficiencies in the C.A.F.E. Practices certification program identified in these reports. As described in paragraphs 53-57 *supra*, egregious labor violations at C.A.F.E. Practices certified farms have continued.

97.     Moreover, Starbucks has repeatedly failed to live up to its own promises regarding C.A.F.E. Practices "zero tolerance" for forced or child labor or wage theft in its supply chain.

98.     Consequently, five years after first urging Starbucks and other certifiers to address their failure to protect workers in the Brazilian coffee industry, Repórter Brasil, in "Certified Coffee, Rightless Workers 2"[36] (a follow-up to its 2016 coffee report), bemoans "a big difference between what certification promises . . . and what it actually delivers" and concludes that "*[u]nder no circumstances*" should certification be "accepted as definitive proof of good practices."[37]

99.     As recently as this October, Repórter Brasil published *another* report documenting a continued pattern of labor violations, including forced and child labor and severe wage theft, carried out by Brazilian coffee farms bearing Starbucks' proprietary C.A.F.E. Practices certification.[38]

100.     Nonetheless, Starbucks continues to point to C.A.F.E. Practices as a guarantee of its ethical coffee sourcing and to represent that "C.A.F.E. Practices verification . . . ensures coffee farmers, their families, and communities are cared for and supported."[39] Starbucks misleadingly fails to disclose facts material to consumer purchasing decisions, including that many of its supposedly ethical suppliers have in fact relied on forced and/or child labor, i.e. that C.A.F.E. Practices certification does not guarantee the absence of forced and child labor.

---

[36] *See* Dallabrida, Campos & Almeida, *supra* note 21.
[37] *Id.* at 26 (emphasis added).
[38] *See* Freitas & Dallabrida, *supra* note 22.
[39] Kelly Goodejohn, *Betting the Farm on the Farm*, STARBUCKS STORIES & NEWS (Sept. 28, 2017), https://stories.starbucks.com/stories/2017/betting-the-farm-on-the-farm/.

101.    Similarly, even while outside investigators have reported on the systemic problems with Rainforest Alliance's certification program, Starbucks has increasingly relied upon it as its primary, if not sole, "ethical" sourcing tool for its tea products.

102.    In 2011, SOMO's thoroughgoing study of Kenyan and Indian tea plantations certified by Rainforest Alliance concluded that Rainforest Alliance "does not seem capable of delivering any real guarantees on decent working conditions."[40]

103.    More recently, the Business and Human Rights Resource Centre's comprehensive review of human rights abuses in the global tea industry called out Starbucks for, among other things, its "over-reliance on [Rainforest Alliance] certification as a guarantee of the protection of rights." As Human Rights Resource Centre noted, "certification of a supplier alone is not enough to ensure" that human rights standards are in fact "implemented and respected."[41] That is, ensuring practical implementation of such standards throughout a supply chain requires greater engagement from buyers such as Starbucks than simply signing on to a certification program.

104.    Starbucks nevertheless continues to rely on Rainforest Alliance certification for its representations that its tea has been ethically sourced. Starbucks also misleadingly fails to disclose facts material to its tea consumers, including that Rainforest Alliance certification is frequently borne by human rights abusing employers, including tea farms that have sourced to Starbucks.

105.    Despite knowledge of the rampant labor abuses occurring on farms certified by C.A.F.E. Practices and Rainforest Alliance, Starbucks has continued to rely on certification by these programs as the basis for its false and misleading claims that its coffee and tea are ethically sourced.

106.    Starbucks' failure to adopt meaningful reforms to its coffee and tea sourcing practices in the face of these critiques and documented labor abuses on its source farms is wholly inconsistent with a reasonable consumer's understanding of what it means to be "committed to

---

[40] Sanne van der Wal, *supra* note 31, at 5.
[41] Kate Jelly, *Boiling Point: Strengthening Corporate Accountability in the Tea Industry* (Business & Human Rights Resource Centre May 2023), https://media.business-humanrights.org/media/documents/2023_tea_report_2205.pdf, at 21.

100% ethical" sourcing. Similarly, Starbucks' failure to disclose to consumers the unreliability of these certification programs and their limitations as a guarantee of ethical sourcing are misleading omissions material to the decision-making of a reasonable consumer. To bring its conduct in line with its ethical sourcing promises, Starbucks must actually reform its coffee and tea sourcing policies and practices so that they are truly protective of the human rights of farm workers that Starbucks purports to respect.

## IV.   Consumers Have Been Injured by Starbucks' Ethical Sourcing Misrepresentations and Material Omissions.

107.   Because consumers will pay more for products that are ethically sourced, Starbucks' false and misleading representations that it is "committed to 100% ethical coffee sourcing" and that the Rainforest Alliance-certified tea it purchases is ethically sourced are material misrepresentations that allow it to artificially inflate its prices and unjustly swell its annual profits, which exceed $21 billion.

108.   Starbucks omits from its advertising and product labeling any disclosure of the defects in its ethical sourcing programs or of the prevalence of unethical worker treatment among its certified suppliers. These omissions are material to consumer purchasing decisions and misleading.

109.   Starbucks' products, including its coffee and tea, cost more than similar products without misleading labeling or material omissions, and would have commanded lower prices in the market absent Starbucks' misleading ethical sourcing claims and material omissions. Starbucks thus collects an undeserved ethical sourcing or "fairwashing"[42] price premium on its coffee and tea products even though they are not in fact ethically sourced.

110.   Many consumers would not purchase Starbucks' coffee or tea—and would purchase from rival producers—if they believed Starbucks was not ethically sourcing its coffee or tea.

---

[42] *See Fairwashing—What it Is and How to Spot it*, THE ETHICAL EDIT (Apr. 7, 2022), https://theethicaledit.ca/blog/fairwashing-what-it-is-and-how-to-spot-it/ (describing "fairwashing" as when a company's advertising creates a false impression that it is committed to fair trade principles).

111.    Starbucks' false and misleading advertising has caused and continues to cause consumers injury in the form of economic loss because it induces them to buy products they otherwise would not purchase. It also causes them injury or economic loss by inducing them to pay more for Starbucks' coffee and tea products than they would absent Starbucks' misrepresentations and material omissions.

## CAUSE OF ACTION
### Violations of the District of Columbia Consumer Protection Procedures Act
### D.C. Code § 28-3901 *et seq.*

112.    Plaintiff realleges and incorporates each of the allegations contained in the preceding paragraphs as if fully set forth herein.

113.    Plaintiff is a non-profit, public-interest organization operating for the purpose of promoting the interests of consumers and brings these claims on behalf of itself and its members, the general public, and District consumers. *See* D.C. Code § 28-3905(k)(1).

114.    Starbucks has advertised and marketed its coffee and tea products with phrases such as "Committed to 100% Ethical Coffee Sourcing" and a "global commitment to fundamental human rights," when, as described above, Starbucks sells coffee and tea products harvested by laborers who are subjected to inhumane conditions that do not meet the standards to which Starbucks purports to commit. Starbucks represents that its coffee and tea sourcing programs and practices are designed to and actually help it comply with various human rights obligations, including those set forth in the UN Guiding principles on Business and Human Rights, UN Global Compact, OECD Guidelines for Multinational Enterprises, International Bill of Rights, ILO Core Labor Standards, Women's Empowerment Principles, Children's Rights and Business Principles, and Framework Principles on Human Rights, but its coffee and tea sourcing programs and practices in actuality do not fulfill these obligations. Thus, Starbucks has violated the CPPA by "represent[ing] that goods . . . have a source . . . [or] characteristics . . . that they do not have"; "represent[ing] that goods . . . are of particular standard, quality, grade, style, or model, if in fact they are of another"; "misrepresent[ing] as to a material fact which has a tendency to mislead"; "represent[ing] that a transaction confers or involves rights, remedies, or

-27-

obligations which it does not have or involve"; "fail[ing] to state a material fact if such failure
tends to mislead"; "us[ing] innuendo or ambiguity as to a material fact, which has a tendency to
mislead"; and "advertis[ing] . . . goods . . . without the intent to sell them as advertised." *See id.* §
28-3904(a), (d), (e), (e-1), (f), (f-1), (h).

115.    Starbucks' deceptive misrepresentations and omissions alleged herein are material
to, at minimum, a significant minority of consumers.

116.    Starbucks' violations of the CPPA have repeatedly occurred in its trade or
business. The acts complained of herein are ongoing and/or have a substantial likelihood of
being repeated.

117.    Starbucks' violations of the CPPA affect the public interest and have injured
countless consumers.

118.    Starbucks' conduct, as complained of herein, is immoral, unethical, oppressive,
contrary to public policy, and/or unscrupulous, and has caused substantial injury to Plaintiff, the
general public, and countless consumers.

119.    Starbucks' violations of the CPPA are outrageous and egregious and carried out in
willful disregard for the rights of consumers to accurate and non-misleading information from
merchants about the goods and services they sell.

120.    Plaintiff is therefore entitled to legal and equitable relief against Starbucks,
including recovery of actual damages, statutory damages and/or treble damages, punitive
damages, attorneys' fees, costs of suit, and an injunction enjoining Starbucks from continuing to
engage in the deceptive misrepresentations and material omissions alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

1.    A declaration that Starbucks' conduct as alleged herein constitutes an unfair and/or
     deceptive trade practice in violation of the District of Columbia Consumer Protection
     Procedures Act, D.C. Code §§ 28-3901 *et seq.*;

2.    A public injunction enjoining Starbucks' violations of the District of Columbia
     Consumer Protection Procedures Act and requiring Starbucks to halt its "Committed

to 100% Ethical Coffee Sourcing" advertising unless and until it lives up to its ethical sourcing promises to consumers and reforms its policies and practices to protect the human rights of farm workers who provide Starbucks' coffee and tea products;

3. An order that Starbucks engage in a corrective advertising campaign;

4. An award of actual damages, according to proof, and treble damages and/or statutory damages, whichever is greater;

5. An award of punitive damages;

6. An award of reasonable attorneys' fees and reasonable costs and expenses of suit;

7. An award of pre- and post-judgment interest as allowed by law;

8. Any further relief that the Court may deem just and appropriate.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.


DATED this 10th day of January, 2024.

<div style="margin-left: 40%">

Respectfully submitted,

By: /s/ Daniel M. Rosenthal
Daniel M. Rosenthal (D.C. Bar No. 1010473)
Charlotte H. Schwartz (D.C. Bar No. 1658311)
**James & Hoffman, P.C.**
1629 K Street NW, Suite 1050
Washington, DC 20006
Telephone: (202) 496-0500
Facsimile: (202) 496-0555
dmrosenthal@jamhoff.com
chschwartz@jamhoff.com

Stacey M. Leyton (*Pro Hac Vice* forthcoming)
Connie K. Chan (*Pro Hac Vice* forthcoming)
Bronwen B. O'Herin (*Pro Hac Vice* forthcoming)
**Altshuler Berzon LLP**
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
sleyton@altshulerberzon.com
cchan@altshulerberzon.com
boherin@altshulerberzon.com

</div>

Sally J. Greenberg (D.C. Bar No. 358314)
**National Consumers League**
1701 K Street NW, Suite 1200
Washington, DC 20006
Telephone: (202) 207-2830
sallyg@nclnet.org

Tracy Rezvani (D.C. Bar No. 464293)
**The Rezvani Law Firm LLC**
9812 Falls Road #114-291
Potomac, MD 20854
Telephone: (202) 350-4270
Facsimile: (202) 351-0544
tracy@rezvanilaw.com

*Attorneys for Plaintiff National Consumers League*

# Superior Court of the District of Columbia

CIVIL DIVISION - CIVIL ACTIONS BRANCH

INFORMATION SHEET

National Consumers League
_____
Plaintiff(s)

vs

Starbucks Corporation
_____
Defendant(s)

Case Number: **2024-CAB-000196**

Date: January 10, 2024

☐ One of the defendants is being sued
in their official capacity.

| Name: *(Please Print)*<br>Daniel M. Rosenthal | Relationship to Lawsuit |
| --- | --- |
| Firm Name:<br>James & Hoffman, P.C. | ☑ Attorney for Plaintiff<br>☐ Self (Pro Se) |
| Telephone No.:        DC Bar No.:<br>(202) 496-0500      1010473 | ☐ Other: _____ |

TYPE OF CASE:  ☐ Non-Jury       ☐ 6 Person Jury       ☑ 12 Person Jury

Demand: $ TBD in an amount to exceed $10,000      Other: declaratory and injunctive relief

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____  Judge:_____  Calendar #:_____

Case No.:_____  Judge:_____  Calendar #:_____

---

NATURE OF SUIT:      *(Check One Box Only)*

**CONTRACT**

☐ Breach of Contract
☐ Breach of Warranty
☐ Condo/Homeowner Assn. Fees
☐ Contract Enforcement
☐ Negotiable Instrument

**COLLECTION/INS. SUB**

☐ Debt Collection
☐ Insurance Subrogation
☐ Motion/Application for Judgment by Confession
☐ Motion/Application Regarding Arbitration Award

**EMPLOYMENT DISPUTE**

☐ Breach of Contract
☐ Discrimination
☐ Wage Claim
☐ Whistle Blower
☐ Wrongful Termination

---

**REAL PROPERTY**

☐ Condo/Homeowner Assn. Foreclosure
☐ Declaratory Judgment
☐ Drug Related Nuisance Abatement

☐ Ejectment
☐ Eminent Domain
☐ Interpleader

☐ Other
☐ Quiet Title
☐ Specific Performance

☐ **FRIENDLY SUIT**
☐ **HOUSING CODE REGULATIONS**
☐ **QUI TAM**
☐ **STRUCTURED SETTLEMENTS**

---

**ADMINISTRATIVE PROCEEDINGS**

☐ Administrative Search Warrant
☐ App. for Entry of Jgt. Defaulted Compensation Benefits
☐ Enter Administrative Order as Judgment
☐ Libel of Information
☐ Master Meter
☐ Petition Other

☐ Release Mechanics Lien
☐ Request for Subpoena

**MALPRACTICE**

☐ Medical – Other
☐ Wrongful Death

**AGENCY APPEAL**

☐ Dangerous Animal Determination
☐ DCPS Residency Appeal
☐ Merit Personnel Act (OEA)
☐ Merit Personnel Act (OHR)
☐ Other Agency Appeal

☐ **APPLICATION FOR INTERNATIONAL FOREIGN JUDGMENT**

CV-496/February 2023

# Information Sheet, Continued

**CIVIL ASSET FORFEITURE**
- ☐ Currency
- ☐ Other
- ☐ Real Property
- ☐ Vehicle

**NAME CHANGE/VITAL RECORD AMENDMENT**
- ☐ Birth Certificate Amendment
- ☐ Death Certificate Amendment
- ☐ Gender Amendment
- ☐ Name Change

**TORT**
- ☐ Abuse of Process
- ☐ Assault/Battery
- ☐ Conversion
- ☐ False Arrest/Malicious Prosecution
- ☐ Libel/Slander/Defamation
- ☐ Personal Injury
- ☐ Toxic Mass
- ☐ Wrongful Death (Non-Medical Malpractice)

**GENERAL CIVIL**
- ☐ Accounting
- ☐ Deceit (Misrepresentation)
- ☐ Fraud
- ☐ Invasion of Privacy
- ☐ Lead Paint
- ☐ Legal Malpractice
- ☐ Motion/Application Regarding Arbitration Award
- ☐ Other - General Civil

- ☐ Product Liability
- ☐ Request for Liquidation
- ☐ Writ of Replevin
- ☐ Wrongful Eviction

**CIVIL I/COMPLEX CIVIL**
- ☐ Asbestos

**MORTGAGE FORECLOSURE**
- ☐ Non-Residential
- ☐ Residential

**STATUTORY CLAIM**
- ☐ Anti – SLAPP
- ☑ Consumer Protection Act
- ☐ Exploitation of Vulnerable Adult
- ☐ Freedom of Information Act (FOIA)
- ☐ Other

**TAX SALE FORECLOSURE**
- ☐ Tax Sale Annual
- ☐ Tax Sale Bid Off

**VEHICLE**
- ☐ Personal Injury
- ☐ Property Damage

- ☐ **TRAFFIC ADJUDICATION APPEAL**
- ☐ **REQUEST FOR FOREIGN JUDGMENT**

/s/ Daniel M. Rosenthal
_____
Filer/Attorney's Signature

January 10, 2024
_____
Date

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

National Consumers League

_____
Plaintiff

vs.

Starbucks Corporation                                    Case Number   **2024-CAB-000196**
_____
Defendant

### SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Daniel M. Rosenthal
_____
Name of Plaintiff's Attorney

James & Hoffman, P.C.                                    _Clerk of the Court_
_____
Address                                                    By _____

1629 K Street, NW, Suite 1050 Washington, DC 20006

(202) 496-0500                                          Date _____January 11, 2024_____
_____
Telephone

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bản dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202)879-4828로 전화주십시요.    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME_.

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
Sección de Acciones Civiles
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
                                   Demandante

          contra

                                                    Número de Caso: _____

_____
                                   Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                        *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                              Por: _____

_____
Dirección                                     Subsecretario

_____

                              Fecha _____
Teléfono
如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828

만약 번역을 원하시면 (202)879-4828 로 전화해주십시요      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

    IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO_.

    Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

                    Vea al dorso el original en inglés
                    See reverse side for English original



**Superior Court of the District of Columbia**
**Civil - Civil Actions Branch**
**500 Indiana Ave NW, Room 5000, Washington DC 20001**
**(202) 879-1133 | www.dccourts.gov**

**Case Number:** 2024-CAB-000196

**Case Caption:** National Consumers League v. Starbucks Corporation

### INITIAL ORDER

| Initial Hearing Date: | Initial Hearing Time: | Courtroom Location: |
|---|---|---|
| Friday, 04/12/2024 | 9:30 AM | Remote Courtroom 320 |

**Please see attached instructions for remote participation.**

Your case is assigned to Associate Judge Jonathan H Pittman.

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby ORDERED as follows:

1) This case is assigned to the judge and calendar designated above. All future filings in this case shall bear the calendar number and judge's name along with the case number in the caption.

2) Within 60 days of the filing of the complaint, plaintiff must file proof of service on each defendant of copies of the summons, the complaint, and this Initial Order. The court will dismiss the claims against any defendant for whom such proof of service has not been filed by this deadline, unless the court extended the time for service under Rule 4.

3) Within 21 days of service (unless otherwise provided in Rule 12), each defendant must respond to the complaint by filing an answer or other responsive pleading. The court may enter a default and a default judgment against any defendant who does not meet this deadline, unless the court extended the deadline under Rule 55(a).

4) At the time stated below, all counsel and unrepresented parties shall participate in a hearing to establish a schedule and discuss the possibilities of settlement. Counsel shall discuss with their clients before the hearing whether the clients are agreeable to binding or non-binding arbitration. This order is the only notice that parties and counsel will receive concerning this hearing.

5) If the date or time is inconvenient for any party or counsel, the Civil Actions Branch may continue the Conference once, with the consent of all parties, to either of the two succeeding days when the calendar is called. To reschedule the hearing, a party or lawyer may call the Branch at (202) 879-1133. Any such request must be made at least seven business days before the scheduled date. No other continuance will be granted except upon motion for good cause shown.

6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Anita M. Josey-Herring

**To Join by Computer, Tablet, or Smartphone:**

1) Copy and Paste or Type the link into a web browser and enter the Webex Meeting ID listed below.

    Link: dccourts.webex.com/meet/ctb320

    Meeting ID: 129 226 9879

2) When you are ready, click "Join Meeting".
3) You will be placed in the lobby until the courtroom clerk gives you access to the hearing.

**Or to Join by Phone:**

1) Call 202-860-2110 (local) or 844-992-4726 (toll-free)
2) Enter the Webex Meeting ID listed above followed by "##"

**Resources and Contact Information:**

1) For best practices on how to participate in Webex Meetings, click here https://www.webex.com/learn/best-practices.html.
2) For technical issues or questions, call the Information Technology Division at 202-879-1928 and select option 2.
3) For case questions, call the Civil Actions Branch Clerk's Office at (202) 879-1133.

## **ACCESSIBILITY AND LANGUAGE ACCESS**

**Persons with Disabilities:**

If you have a disability as defined by the American Disabilities Act (ADA) and you require an accommodation, please call 202-879-1700 or email ADACoordinator@dcsc.gov . The D.C. Courts does not provide transportation service.

**Interpreting and Translation Services**:

The D.C. Courts offers free language access services to people having business with the court who are deaf or who are non-English speakers. Parties to a case may request free translations of court orders and other court documents. To ask for an interpreter or translation, please contact the Clerk's Office listed for your case. For more information, visit https://www.dccourts.gov/language-access.

**Servicios de interpretación y traducción:**

Los Tribunales del Distrito de Columbia ofrecen servicios gratuitos de acceso al idioma a las personas sordas o que no hablan inglés que tienen asuntos que atender en el tribunal. Las partes de un caso pueden solicitar traducciones gratuitas de las órdenes judiciales y otros documentos del tribunal. Para solicitar un intérprete o una traducción, póngase en contacto con la Secretaría de su caso.

Para más información, visite https://www.dccourts.gov/language-access.

El acceso al idioma es importante para los Tribunales del Distrito de Columbia. Puede dar su opinión sobre los servicios de idiomas visitando https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access.

**የቃልና የጽሑፍ ትርጓሜ አገልግሎቶች:**

የዲ.ሲ ፍርድ ቤቶች መስማት ለተሳናቸውና የእንግሊዝኛ ቋንቋ ተናጋሪ ላልሆኑ በፍርድ ቤቱ ጉዳይ ላላቸው ሰዎች ነጻ የቋንቋ ተደራሽነት አገልግሎቶች ያቀርባል። ተከራካሪ ወገኖች የፍርድ ቤት ትእዛዞችና ሌሎች የፍርድ ቤት ሰነዶች በነጻ እንዲተረጎሙላቸው መጠየቅ ይችላሉ። የቃል ወይም የጽሑፍ ትርጓሜ ለመጠየቅ እባክዎን በመዝገብዎ የተዘረዘሩትን የጸሀፊ ቢሮ (ክለርክ'ስ ኦፊስ) ያናግሩ። ለተጨማሪ መረጃ https://www.dccourts.gov/language-access ይጎብኙ።

የቋንቋ ተደራሽነት ለዲ.ሲ. ፍርድ ቤቶች አስፈላጊ ነው። የቋንቋ አገልግሎቶች በተመለከተ አስተያየትዎን https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access በመጎብኘት መስጠት ይችላሉ።

# Tips for Attending Remote Hearings - Civil Division

*Your court hearing may be held remotely. This means that you will participate by phone or by video conference instead of coming to the courthouse. Here are some tips on how to prepare.*

## How do I know if I have a remote hearing?

The Court will contact you to tell you that your hearing is remote. They may contact you by sending you an email, letter in the mail, or by calling you.



## How do I take part in a remote hearing?

The Court will give you step-by-step instructions on how to take part in the remote hearing.

If you lose your written notice, call the Civil Actions Clerk's Office for instructions at:

📞 202-879-1133

## Is there anything that I should do before the day of the hearing?

- Let the court know immediately if you cannot join a hearing because you do not have a phone or computer.

  📞 Civil Actions Clerk's Office: 202-879-1133

- You may want to contact an attorney for legal help.
- You can also find the list of legal services providers at dccourts.gov/coronavirus by clicking on the link that says, "List of Legal Service Providers for Those Without an Attorney."
- Evidence: if you want the judge to review photos or documents, ask the judge how to submit your evidence.
- Witnesses: tell the judge if you want a witness to testify at your hearing.
- Accommodations & Language Access: let the court know if you need an interpreter or other accommodation for your hearing.

## Tips for the Hearing



- Join the hearing a few minutes early!
- Charge your computer or phone and make sure you have enough minutes to join the call. Find a private and quiet space. If possible, be alone in a room during the hearing. Try to limit distractions as much as possible. If others are in the room with you, ask if they can be quiet during the hearing.
- Mute your microphone when you are not talking. Mute all sounds on your phone or computer.
- Say your name before you speak so the record is clear. Be prepared to identify your role in the hearing (e.g., observer, plaintiff, defendant, witness, etc.).
- Speak slowly and clearly so everyone hears what you are saying.
- Pause before speaking in case there is a lag. Use a headset or headphones if you can. This will free up your hands and sound better.
- Try not to talk over anyone else. Only one person can speak at a time. If you talk while someone else is talking, the judge will not be able to hear you.
- Have all your documents for the hearing in front of you. Have a pen and paper to take notes.
- If you are not ready for your hearing or want to speak with an attorney, you can ask the judge to postpone your hearing for another date.
- If your sound or video freezes during the hearing, use the chat feature or call the Clerk's Office to let them know that you are having technical issues.

## Special Tips for Video Hearings
## (Click here for more information)



- Download the court's hearing software, WebEx, in advance and do a test run! The Court will provide you with a WebEx link in advance of the hearing.
- Set up the camera at eye level. If you are using your phone, prop it up so you can look at it without holding it.
- Look at the camera when you speak and avoid moving around on the video.
- Wear what you would normally wear to court.
- Sit in a well-lit room with no bright lights behind you.
- If possible, find a blank wall to sit in front of. Remember the judge will be able to see everything on your screen, so pick a location that is not distracting.




# District of Columbia Courts

# Tips for Using DC Courts Remote

The DC Courts have **remote hearing sites** available in various locations in the community to help persons who may not have computer devices or internet service at home to participate in scheduled remote hearings.  The Courts are committed to enhancing access to justice for all.

There are six remote access sites throughout the community which will operate: **Monday – Friday, 8:30 am – 4:00 pm.**

### The remote site locations are:



| | |
|---|---|
| **Remote Site - 1**<br>Balance and Restorative Justice Center<br>1215 South Capitol Street, SW<br>Washington, DC 20003 | **Remote Site - 4**<br>Balance and Restorative Justice Center<br>920 Rhode Island Avenue, NE<br>Washington, DC 20018 |
| **Remote Site - 2**<br>Balance and Restorative Justice Center<br>1110 V Street, SE<br>Washington, DC 20020 | **Remote Site - 5**<br>Reeves Center<br>2000 14th Street, NW, 2nd Floor<br>Community Room<br>Washington, DC 20009 |
| **Remote Site - 3**<br>Balance and Restorative Justice Center<br>118 Q Street, NE<br>Washington, DC 20002 | **Remote Site - 6**<br>Reeves Center<br>2000 14th Street, NW, Suite 300N<br>Office of the Tenant Advocate<br>Washington, DC 20009<br>*** No walk-ins at this location*** |

If you want to use a remote site location for your hearing, call **202-879-1900** or email DCCourtsRemoteSites@dcsc.gov **at least 24 hours before your hearing to reserve a remote access computer station**.  If you require special accommodations such as an interpreter for your hearing, please call **202-879-1900 at least 24 hours in advance of your hearing so the Courts can make arrangements**.

**\*You should bring the following items when you come to your scheduled site location\***

1. Your **case number** and any **hyperlinks** provided by the Courts for your scheduled hearing.
2. Any documents you need for the hearing (evidence), including exhibits, receipts, photos, contracts, etc.
3. Materials for notetaking, including pen and paper.

**\*Safety and security measures are in place at the remote sites.**

**Contact information to schedule your remote access computer station:**
Call:  **202-879-1900**
Email:  DCCourtsRemoteSites@dcsc.gov




# Tribunales del Distrito de Columbia

## Consejos para usar los sitios de audiencia remota de los Tribunales de DC

Los Tribunales de DC disponen de **sitios de audiencia remota** en distintos centros de la comunidad para ayudar a que las personas que no tienen dispositivos informáticos o servicio de Internet en su casa puedan participar en audiencias remotas programadas. Los Tribunales honran el compromiso de mejorar el acceso de toda la población a la justicia.

En toda la comunidad hay seis sitios de acceso remoto que funcionarán de l**unes a viernes, de 8:30 am a 4:00 pm**.

Los centros de acceso remoto son:



**Sitio Remoto - 1**
Balance and Restorative Justice Center
1215 South Capitol Street, SW
Washington, DC 20003

**Sitio Remoto - 2**
Balance and Restorative Justice Center
1110 V Street, SE
Washington, DC 20020

**Sitio Remoto - 3**
Balance and Restorative Justice Center
118 Q Street, NE
Washington, DC 20002

**Sitio Remoto - 4**
Balance and Restorative Justice Center
920 Rhode Island Avenue, NE
Washington, DC 20018

**Sitio Remoto - 5**
Reeves Center
2000 14th Street, NW, 2nd Floor
Community Room
Washington, DC 20009

**Sitio Remoto - 6**
Reeves Center
2000 14th Street, NW, Suite 300N
Office of the Tenant Advocate
Washington, DC 20009
*No se puede entrar sin cita previa*

Si desea usar un sitio remoto para su audiencia, llame al **202-879-1900** o envíe un mensaje de correo electrónico a DCCourtsRemoteSites@dcsc.gov **al menos 24 horas antes de la audiencia, para reservar una estación de computadora de acceso remoto. Si** necesita adaptaciones especiales, como un intérprete para la audiencia, llame **al 202-879-1900 al menos 24 horas antes de la audiencia para que los Tribunales puedan hacer los arreglos necesarios.**

**\*Cuando concurra al sitio programado debe llevar los siguientes artículos\***

1. Su **número de caso** y todos los **hipervínculos** que le hayan proporcionado los Tribunales para la audiencia programada.

2. Cualquier documento que necesite para la audiencia (prueba), incluidos documentos probatorios, recibos, fotos, contratos, etc.

3. Materiales para tomar nota, como papel y lápiz.

**\*Los sitios de acceso remoto cuentan con medidas de seguridad y protección.**

**Información de contacto para programar su estación de computadora de acceso remoto:**
Teléfono: **202-879-1900**
Correo electrónico: DCCourtsRemoteSites@dcsc.gov