# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL CONSUMERS LEAGUE,

               Plaintiff,

v.

STARBUCKS CORPORATION,

               Defendant.

Civil Action No. 1:24-cv-00421-RBW

## DEFENDANT'S MOTION TO DISMISS COMPLAINT

Defendant Starbucks Corporation respectfully moves this Court under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Complaint in this matter.

A Memorandum of Points and Authorities in support of the Motion and a Proposed Order are attached.

Dated: April 5, 2024

Respectfully submitted,

/s/ Karl A. Racine
Karl A. Racine (D.C. Bar No. 431534)
David M. Foster (D.C. Bar No. 497981)
Carolyn A. DeLone (D.C. Bar No. 1004476)
Jay Jones (D.C. Bar No. 90008076)
Reedy C. Swanson (D.C. Bar No. 230795)
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
karl.racine@hoganlovells.com
david.foster@hoganlovells.com
carrie.delone@hoganlovells.com
jay.jones@hoganlovells.com
reedy.swanson@hoganlovells.com

*Attorneys for Starbucks Corporation*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL CONSUMERS LEAGUE, | |
| Plaintiff, | |
| v. | Civil Action No. 1:24-cv-00421-RBW |
| STARBUCKS CORPORATION, | |
| Defendant. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

      A.   The Defendant's Supply Chain Policies .................................................... 3

      B.   The Plaintiff's Allegations .................................................................... 6

LEGAL STANDARD ............................................................................................................. 8

ARGUMENT ........................................................................................................................... 9

I.    The Plaintiff Fails to Allege a Violation of the CPPA ........................................ 10

      A.   The Defendant's Statements About its Commitments Are Not False or Misleading. ......................................................................................... 10

      B.   The Defendant's Statements About its Supply Chain Practices Are Not False or Misleading. ...................................................................... 16

            1.   The Defendant Accurately Represents its Verification Standards and Practices. ..................................................................................... 16

            2.   The Defendant Accurately Describes its Zero-Tolerance Policy Procedures. .......................................................................................... 20

            3.   The Defendant's Other Statements About Ethical Sourcing Practices Are Not Misleading. ............................................................................ 22

      C.   The Plaintiff Cannot State a Claim Based on Statements Outside the Limitations Period. ............................................................................. 23

II.   Imposing Liability for Statements About the Defendant's Commitments and Corporate Responsibility Would Violate the First Amendment. ................................... 25

      A.   The First Amendment Protects Corporate Speech on Matters of Public Importance. ....................................................................................... 25

      B.   The Defendant's Online Statements Are Not Commercial Speech. ..................... 28

            1.   Starbucks Global Academy ....................................................... 28

            2.   The Defendant's Website and Social Media Accounts ............................. 29

      C.   The Plaintiff's Construction of the CPPA Cannot Withstand Strict Scrutiny ...... 30

CONCLUSION....................................................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases***

*Alicke v. MCI Commc'ns Corp.*
    111 F.3d 909 (D.C. Cir. 1997) ................................................... 9

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009) ................................................... 9

***Barber v. Nestlé USA Inc.*
    154 F. Supp. 3d 957 (C.D. Cal. 2015) ................................... 11, 12, 13, 20

*Barber v. Nestlé USA Inc.*
    730 F. App'x 464 (9th Cir. 2018) ................................................... 11

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*
    140 S. Ct. 2335 (2020) ................................................... 30

*Bolger v. Youngs Drug Prod. Corp.*
    463 U.S. 60 (1983) ................................................... 26, 27, 29

***Bradford v. George Washington Univ.*
    249 F. Supp. 3d 325 (D.D.C. 2017) ................................... 8, 9, 23, 24

*Hoyte v. Yum! Brands*, Inc.
    489 F. Supp. 2d 24 (D.D.C. 2007) ................................................... 23

*Budach v. NIBCO, Inc.*
    No. 2:14-CV-04324, 2015 WL 3853298 (W.D. Mo. June 22, 2015) ................... 23

*City of Pontiac Policeman's & Fireman's Retirement Sys. v. UBS AG*
    752 F.3d 173 (2d Cir. 2014) ................................................... 10

*Ctr. for Inquiry Inc. v. Walmart, Inc.*
    283 A.3d 109 (D.C. 2022) ................................................... 9, 13

*Diamond v. Davis*
    680 A.2d 364 (D.C. 1996) ................................................... 23

*Doe v. Roman Catholic Diocese of Greensburg*
    581 F. Supp. 3d 176 (D.D.C. 2022) ................................................... 3

---

* Asterisks designate cases or authorities that counsel chiefly relies upon.

*Dulberg v. Uber Techs., Inc.*
  No. C 17-00850 WHA, 2017 WL 3232426 (N.D. Cal. July 31, 2017) ..................................... 3

*\*Dwyer v. Allbirds, Inc.*
  598 F. Supp. 3d 137 (S.D.N.Y. 2022) .......................................................... 16, 17, 22

*\*Earth Island Inst. v. Coca-Cola Co.*
  No. 2021 CA 001846 B, 2022 D.C. Super. LEXIS 59 (D.C. Super. Nov. 10, 2022) ........ *passim*

*E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*
  496 F. Supp. 3d 338 (D.D.C. 2020) .................................................................. 22

*Ellipso, Inc. v. Mann*
  460 F. Supp. 2d 99 (D.D.C. 2006) .................................................................. 15

*First Nat'l Bank of Boston v. Bellotti*
  435 U.S. 765 (1978) .............................................................................. 26, 31

*Freeland v. Iridium World Commc'ns*
  545 F. Supp. 2d 59 (D.D.C. 2008) .................................................................. 22

*Gordon v. Target Corp.*
  No. 20-CV-9589 (KMK), 2022 WL 836773 (S.D.N.Y. Mar. 18, 2022) ................................. 18

*\*Herceg v. Chobani, LLC*
  No. 22-CV-5137 (KMK), 2023 WL 6162939 (S.D.N.Y. Sept. 21, 2023) ............. 16, 17, 18, 22

*Hoff v. Wiley Rein, LLP*
  110 A.3d 561 (D.C. 2015) .......................................................................... 11

*Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*
  638 F. App'x 778 (10th Cir. 2016) ............................................................... 12, 13

*Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*
  385 U.S. 589 (1967) .............................................................................. 27, 29

*Lizama v. H&M Hennes & Mauritz LP*
  No. 4:22 CV 1170 RWS, 2023 WL 3433957 (E.D. Mo. May 12, 2023) ................................. 18

*McMullen v. Synchrony Bank*
  300 F. Supp. 3d 292 (D.D.C. 2018) ............................................................... 18, 19

*Nat'l Ass'n of Mfrs. v. SEC*
  800 F.3d 518 (D.C. Cir. 2015) .................................................................... 28

*\*Nat'l Consumers League v. Wal-Mart Stores, Inc.*
  No. 2015 CA 007731 B, 2016 WL 4080541 (D.C. Super. July 22, 2016) ...................... *passim*

*ONY, Inc. v. Cornerstone Therapeutics*
  720 F.3d 490 (2d Cir. 2013) ................................................................. 27

*\*Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of California.*
  475 U.S. 1 (1986) ....................................................... 26, 27, 29, 30

*Pearson v. Chung*
  961 A.2d 1067 (D.C. 2008) ............................................................ 9, 22

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*
  487 U.S. 781 (1988) ...................................................................... 26, 28

*Saucier v. Countrywide Home Loans*
  64 A.3d 428 (D.C. 2013) ................................................................. 9, 13

*Sector Coll. & Univ. v. Duncan*
  681 F.3d 427 (D.C. Cir. 2012) ........................................................... 31

*Sibley v. St. Albans School*
  134 A.3d 789 (D.C. 2016) ............................................................ 11, 12

*Silvious v. Snapple Beverage Corp.*
  793 F. Supp. 2d 414 (D.D.C. 2011) ..................................................... 23

*Sissel v. U.S. Dept. of Health & Human Servs.*
  760 F.3d 1 (D.C. Cir. 2014) ................................................................. 3

*Sorrell v. IMS Health Inc.*
  564 U.S. 552 (2011) .......................................................................... 26

*Stone v. Landis Constr. Co.*
  120 A.3d 1287 (D.C. 2015) ............................................................... 13

*Thornhill v. Alabama*
  310 U.S. 88 (1940) ............................................................... 26, 28, 30

*Turner Broadcasting Sys., Inc. v. FCC*
  512 U.S. 622 (1994) .......................................................................... 28

*Underwager v. Salter*
  22 F.3d 730 (7th Cir. 1994) ............................................................... 27

*United States v. Playboy Ent. Grp., Inc.*
  529 U.S. 803 (2000) ..................................................................... 28, 31

*Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.*
  425 U.S. 748 (1976) ................................................... 26, 27, 29, 31

*Whiting v. AARP*
　701 F. Supp. 2d 21 (D.D.C. 2010) ............................................................... 9

*XYZ Two Way Radio Serv., Inc. v. Uber Techs. Inc.*
　214 F. Supp. 3d 179 (E.D.N.Y 2016)................................................. 11, 12, 14, 15

**Statutes**

D.C. Code § 12-301 .......................................................................................... 23

**INTRODUCTION**

The fundamental and inaccurate premise of this lawsuit is that a company misleads its consumers by saying it is "committed to" achieving a particular goal—here, ethical sourcing—if it has not yet perfectly achieved that goal. Courts around the country have dismissed cases raising similar theories of deception for a simple reason: No reasonable consumer would understand a statement that a company is "committed to" achieving ethical sourcing of its products to mean that the company already has a flawless supply chain.

Make no mistake: The defendant, Starbucks Corporation, condemns in the strongest possible terms labor violations like those described in the Complaint, ECF No. 1-2 ("Compl."). It developed one of the coffee industry's first ethical sourcing standards, which includes stringent auditing requirements and a zero-tolerance policy for violations of certain labor standards, including forced labor, child labor, abuse, and failure to pay the applicable minimum wage. The defendant takes alleged violations of its zero-tolerance standards extremely seriously, immediately investigates such allegations thoroughly, and stops purchasing coffee from that supplier until it can verify full compliance with the defendant's ethical sourcing requirements.

Nothing in the Complaint alleges any differently. The plaintiff, National Consumers League, primarily contends that the defendant misleads consumers in violation of the District of Columbia's Consumer Protection Procedures Act (CPPA) by saying that it is "committed to 100% ethical sourcing." The plaintiff's theory is that this statement will mislead consumers into believing that the defendant has successfully eradicated all potential labor violations from a massive global supply chain featuring hundreds of thousands of third-party farmers in dozens of countries. No reasonable consumer would understand the defendant to have made such a representation.

The plaintiff also fails to plausibly allege that the defendant has misleadingly or falsely described the ethical standards it uses to implement its commitment. The plaintiff contends that

some of the defendant's statements about its ethical standards are either misleading—because the standards are insufficiently stringent—or false—because the defendant does not implement the standards as advertised. Several statements along these lines are time-barred. For those that are not, the alleged labor violations on farms that supposedly supplied the defendant with coffee or tea in the past are insufficient to state a claim because there is no allegation that the defendant represented that its ethical sourcing would prevent all labor violations. Indeed, the defendant has consistently and transparently acknowledged the need for continuous improvement in pursuit of its ethical sourcing goals.

As a general rule, the Complaint carefully avoids alleging how the defendant responded to the alleged labor violations detailed in the Complaint. Where the plaintiff includes details about the defendant's responses, the allegations do not demonstrate any inconsistency with the defendant's statements. Indeed, as to two farms, the plaintiff *admits* that the defendant in fact terminated its relationship with those farms. As to others, however, the plaintiff alleges at most that these farms retained their program verification status after violations were alleged. But nothing in the Complaint alleges that a farm must immediately lose its verification status any time a labor violation is alleged, even when the violation triggers the defendant's zero-tolerance policy. Instead, that policy describes a corrective action process that violators must undergo, and the plaintiff nowhere alleges that any supplier farm with a covered violation was exempted from that process.

The plaintiff's theory of liability under the CPPA also runs afoul of the First Amendment. The plaintiff's Complaint sweeps far beyond commercial speech, to include the defendant's educational materials produced in partnership with a major university and speech on its website about issues important to the industry at large. If the CPPA purported to regulate or prohibit that speech based on its content, that would be a straightforward violation of the First Amendment.

2

These constitutional concerns are yet another reason not to accept the plaintiff's expansive theory of the CPPA.

At its core, the plaintiff seeks to hold the defendant liable not because its statements are false, but because the plaintiff wants to impose its *own* commitments and standards on the defendant. A false-advertising lawsuit is not an appropriate forum for such an effort. Ironically, holding the defendant liable under this theory would undermine the goals that the plaintiff purports to champion, because it would create enormous pressure for companies to avoid making public commitments to more ethical sourcing and to eliminate transparency measures specifically designed to help advance those goals. The result would be that consumers find themselves with *less* information about the products that they buy. The Complaint should be dismissed.

**BACKGROUND[1]**

### A.    The Defendant's Supply Chain Policies

The defendant is a leading retailer of coffee and tea products. *See* Compl. ¶ 15. The defendant generally does not grow the coffee or tea it sells; to meet the global demand for its products, the defendant relies on a large and complex global supply chain. *See id.* ¶¶ 4, 7; *accord* Starbucks, *Coffee* ("We source from over 400,000 farmers in more than 30 countries.") (cited in Compl. ¶ 42).[2] Although the defendant neither owns nor manages these farms, it is committed to ensuring that the products it sells are produced without reliance on forced labor, child labor, or other inhumane practices.

---

[1] Solely for purposes of this motion under Rule 12(b)(6), the defendant assumes that all well-pled allegations of fact in the complaint are true. *See Sissel v. U.S. Dept. of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014). A court considering a Rule 12 motion may take judicial notice of the contents of websites incorporated by reference into the complaint by citation with a hyperlink. *See Doe v. Roman Catholic Diocese of Greensburg*, 581 F. Supp. 3d 176, 189, 195 (D.D.C. 2022); *Dulberg v. Uber Techs., Inc.*, No. C 17-00850 WHA, 2017 WL 3232426, at *3 (N.D. Cal. July 31, 2017).

[2] https://www.starbucks.com/responsibility/sourcing/coffee (last visited Apr. 5, 2024).

3

To implement this commitment, the defendant adopted rigorous requirements for its coffee and tea suppliers. For coffee, the defendant has developed its own standards called Coffee and Farmer Equity Practices, which is known as C.A.F.E. Practices. *See* Compl. ¶ 32. C.A.F.E. Practices was developed in 2004 with Conservation International as "one of the coffee industry's first set of ethical sourcing standards" and "includes a third-party verification process . . . responsible for ensuring the quality and integrity of the audits." Starbucks, *Coffee*. The program "consists of more than 200 indicators—from financial reporting to protecting workers' rights and conserving water and biodiversity" and other economic, social and environmental criteria "to promote transparent, profitable and sustainable coffee growing practices while also protecting the well-being of coffee farmers and workers, their families and their communities." *Id.* C.A.F.E. Practices "is just *one of the ways* in which [Starbucks is] providing holistic support to farmers and their communities to ensure a sustainable future of coffee for all." *Id.* (emphasis added) (discussing additional support the defendant provides to farmers, including "farmer loans, open-source agronomy work, farmer support centers, tree donations, and Origin Grants").

C.A.F.E. Practices involves a "zero tolerance" policy for violations of certain "indicators"—that is, progress benchmarks that C.A.F.E. Practices sets for participating farms. *See* Compl. ¶ 35. These indicators include "compliance with minimum wage law and absence of forced or child labor." *Id.* "[F]arms that fail to meet the zero-tolerance indicators . . . are not allowed to participate in the program until corrective action is taken and correction is confirmed." *Id.* (citing Starbucks & Ariz. State Univ., Coffee Academy 300, Module 5.9 – Social Responsibility).[3]

---

[3] This module can be located after creating a Starbucks Global Academy account and logging in at https://courses.starbucksglobalacademy.com/courses/course-v1:ASU+CA300OE+2019/course/ (last visited Apr. 5, 2024). For the Court's convenience, it is attached as Exhibit 1.

For tea, the defendant sources its tea from farms certified by Rainforest Alliance, a third-party non-profit organization that focuses on social and environmental issues. Compl. ¶ 33. The Rainforest Alliance program is built on a model of "continuous improvement" that "monitor[s] the farm, farm group, or processing site for signs of [labor] violations" and provides "[r]emediation steps" for violations that are identified. Rainforest Alliance, *What's in Our 2020 Certification Program?* (cited in Compl. ¶ 88 & n.33).[4] The model is designed to give farmers an economic incentive to fix any violations that are identified, but "[i]n severe cases sanctions such as suspension and decertification can still be used." *Id.* In fiscal year 2020, 99.7% of the defendant's tea was sourced from Rainforest Alliance certified farms. *See* Starbucks, *Tea* (cited in Compl. ¶ 33 n.11).[5] The defendant is also a member of the Ethical Tea Partnership and The Tea Association of the USA. *Id.*

At the same time, the defendant has been transparent that its efforts to achieve its ethical sourcing goals are a work in progress. *See, e.g.*, Starbucks, *Global Human Rights Statement* (Nov. 17, 2020) (stressing that "[o]ur company's pursuit of good is an ongoing effort" and noting the company's "value of continuous improvement") (cited in Compl. ¶ 30 n.7).[6] The defendant therefore remains committed to improvement and eliminating issues that affect its supply chain. *See, e.g.*, Starbucks, *Tea* (emphasizing the defendant's commitment to "improving the overall sustainability and transparency of our tea supply chain" and "continu[ing] to evolve and improve our ethical sourcing standard").

---

[4] https://www.rainforest-alliance.org/wp-content/uploads/2020/06/2020-program-assess-address.pdf (last visited Apr. 5, 2024).

[5] https://www.starbucks.com/responsibility/sourcing/tea/ (last visited Apr. 5, 2024).

[6] https://stories.starbucks.com/press/2020/global-human-rights-statement/ (last visited Apr. 5, 2024).

B.        The Plaintiff's Allegations

The plaintiff is a national advocacy organization that purports to "encourage and promote accurate labeling on food and beverage products" and to "advocate[] on behalf of workers' rights." Compl. ¶¶ 10-11. It alleges that the defendant has made false or misleading statements about its commitment to social responsibility and its practices related to its supply chain.

The plaintiff first targets statements about the defendant's own institutional commitments. Specifically, the plaintiff asserts that it is misleading for the defendant to represent that it is "committed to 100% ethical sourcing" of its products. *See, e.g.*, *id.* ¶¶ 1, 29. According to the plaintiff, the "front of every bag of coffee beans that Starbucks sells" in its stores, on its website, and in many "third-party retailers" includes this phrase. *Id.* ¶¶ 41, 43-46. The plaintiff also alleges that the defendant also includes similar statements about tea products on its own website and on products sold by third-party retailers. *See id.* ¶¶ 47-48. Although the phrasing varies slightly depending on the product, each of these statements relates to the defendant's overall "commitment" to ethical sourcing. *See id.* ¶¶ 41-48.

The plaintiff also takes aim at statements on the defendant's website about the standards the defendant has adopted relating to its supply chain. The plaintiff points to certain statements available on the Starbucks Global Academy website, an online "curriculum organized by Starbucks areas of passion and expertise, in partnership with Arizona State University." Starbucks & Ariz. State Univ., *About Starbucks Global Academy* (cited in Compl. ¶¶ 31 n.9, 35 & n.13, 42 n.16).[7] The curriculum invites anyone interested to discover "the topics that align to your personal or professional growth and development" and to "use what you learn to promote more open conversations, build stronger connections, and do good in your community." *Id.*

---

[7] https://starbucksglobalacademy.com/ (last visited Apr. 5, 2024).

The plaintiff cites a module within the Starbucks Global Academy website that includes a high-level description of the defendant's "zero-tolerance policy" for noncompliance with minimum-wage laws and the use of forced or child labor. *Id.* The module, according to the plaintiff, "teaches customers that coffee '[f]arms that fail to meet the zero-tolerance indicators [compliance with minimum wage law and absence of forced or child labor] are not allowed to participate in the program until corrective action is taken and correction is confirmed.'" *Id.* ¶ 35 (quoting Starbucks & Ariz. State Univ., Coffee Academy 300, Module 5.9 – Social Responsibility).

The plaintiff also points to a video on the Starbucks Global Academy website titled "Committed to 100% Ethical Coffee Sourcing." *See* Starbucks & Ariz. State Univ., *Committed to 100% Ethical Coffee Sourcing* (cited in Compl. ¶ 42 n.16).[8] The narrator introduces himself as a "green coffee buyer at Starbucks," who participates in "sourcing coffee from around the world." *Id.* Describing the defendant's "ethical sourcing stamp," the video's narrator states it is "a lot more than just a stamp"—"[i]t means that we are buying coffee, making sure that it's good for the planet and good for the people who produce it." *Id.* After asking "how do we know that our coffee is ethically sourced," the narrator answers it is because "we've developed rigorous ethical sourcing guidelines that is verified by third party scientific certification systems." *Id.* The narrator continues, "we're not only buying ethically sourced coffee, we're buying coffee that is traceable and transparent." *See id.*

Finally, the plaintiff cites two posts from the defendant's X (formerly Twitter) feed, both from 2020. *See* Compl. ¶ 49. The first reads: "Forced labor is a practice that we do not and will not support. In addition, we have C.A.F.E. practices to ensure that we're ethically sourcing our

---

[8] This video can be found by clicking on the video with this title at https://starbucksglobalacademy.com/coffee-academy/ongoing-learning/ (last visited Apr. 5, 2024).

coffee." *Id.* The second statement, dated July 27, 2020, states that "Starbucks has no business relationships with suppliers that use forced labor and has a zero-tolerance policy on prison labor. Since 2006, our Supplier Social Responsibility Standards make clear we do not tolerate the use of prison labor." *Id.*

According to the plaintiff, these statements are all misleading because the defendant's practices have not in fact eliminated *all* labor issues in the defendant's global supply chain. *See id.* ¶¶ 52, 62, 92, 100. The plaintiff supports this theory with allegations of a handful of instances where labor violations allegedly occurred on farms supplying the defendant with coffee or tea. *See id.* ¶¶ 53-57, 65-70, 85-86, 94-95, 99, 102-104. With respect to two of these farms—including the only tea farm where violations were alleged to have occurred—the plaintiff acknowledges that the defendant ended its relationship with the farm after the allegations came to light. *See id.* ¶¶ 55, 68. In other instances, however, the plaintiff alleges that the farms maintained their status in C.A.F.E. Practices despite the allegations. *Id.* ¶¶ 53, 54, 67, 69, 70. The plaintiff includes no allegations about whether any of these farms were asked to complete—or did in fact complete—any corrective action plan under the zero-tolerance policy. *See id.* ¶¶ 53, 55-56, 65-70.

The plaintiff filed this Complaint in D.C. Superior Court on January 10, 2024. The Complaint contains a single count, alleging a violation of several subsections of the CPPA that generally prohibit "false" or "misleading" statements. *See id.* ¶ 114 (citing D.C. Code § 28-3904(a), (d), (e), (e-1), (f), (f-1), and (h)). The defendant timely removed on February 12, 2024.[9]

## LEGAL STANDARD

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Bradford v.*

---

[9] The plaintiff has moved to remand this case to the Superior Court, and that motion remains pending.

*George Washington Univ.*, 249 F. Supp. 3d 325, 331-32 (D.D.C. 2017) (cleaned up). The plaintiff is entitled to all reasonable inferences from the facts alleged, but "raising a 'sheer possibility that a defendant has acted unlawfully' fails to satisfy the facial plausibility requirement." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court looks to both "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice,'" *id.* (citation omitted), including websites hyperlinked within the complaint, *supra* n.1.

In assessing whether the plaintiff's allegations plausibly plead an unfair or deceptive trade practice through the use of material misrepresentations or omissions, a court must "consider an alleged unfair trade practice 'in terms of how the practice would be viewed and understood by a reasonable consumer.'" *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 442 (D.C. 2013) (quoting *Pearson v. Chung*, 961 A.2d 1067, 1075 (D.C. 2008)). To that end, challenged statements must be "viewed in context"—that is, in light of any accompanying information—rather than "in isolation." *Whiting v. AARP*, 701 F. Supp. 2d 21, 29-30 & n.7 (D.D.C. 2010). "[E]xperience and common sense" may require a court "to dismiss a CPPA complaint for failure to state a claim." *Ctr. for Inquiry Inc. v. Walmart, Inc.*, 283 A.3d 109, 121 n.12 (D.C. 2022). Thus, where a representation "could [not] mislead a reasonable customer," a CPPA claim may be dismissed as a matter of law. *Alicke v. MCI Commc'ns Corp.*, 111 F.3d 909, 912 (D.C. Cir. 1997).

## ARGUMENT

The plaintiff fails to state a claim under the CPPA. The Complaint's leading theory is that the defendant would mislead a consumer into thinking that the defendant has already achieved 100% ethical sourcing by stating that it is "committed to 100% ethical sourcing." Court after court, in the District of Columbia and elsewhere, has rejected variations of this theory because no reasonable consumer would understand a statement about a company's "commitment" to

guarantee a particular result. The plaintiff's other theories of liability grounded in the defendant's statements about C.A.F.E. Practices and Rainforest Alliance are neither false nor misleading. Finally, if the plaintiff's allegations *could* be read to state a CPPA violation, they would run headlong into the First Amendment's protections for free speech—providing yet another reason to avoid reading the statute as broadly as the plaintiff urges.

I.    **The Plaintiff Fails to Allege a Violation of the CPPA.**

A.    **The Defendant's Statements About its Commitments Are Not False or Misleading.**

The plaintiff's argument that the CPPA prohibits the defendant from representing that it is "committed to" 100% ethical sourcing if its products have not yet achieved that goal defies common sense and finds no basis in the law.

Courts routinely hold that "aspirational sentiments, such as future goals or vague corporate ethos," are not actionable under the CPPA. *Earth Island Inst. v. Coca-Cola Co.*, No. 2021 CA 001846 B, 2022 D.C. Super. LEXIS 59, at *3 (D.C. Super. Nov. 10, 2022). That is because statements about "efforts to achieve certain quality standards" are a species "of 'puffery' and are [therefore] non-actionable." *Nat'l Consumers League v. Wal-Mart Stores, Inc.*, No. 2015 CA 007731 B, 2016 WL 4080541, at *5 (D.C. Super. July 22, 2016). Indeed, it "is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery'" because they are "too general to cause a reasonable [consumer] to rely upon them." *City of Pontiac Policeman's & Fireman's Retirement Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014); *accord Wal-Mart Stores*, 2016 WL 4080541, at *5 (citing this language from *City of Pontiac* in dismissing CPPA claims in relevant part). Similarly, "[a] mere prophecy or prediction of something that is hoped for or expected to occur in the future is not actionable upon

10

its nonoccurrence." *Hoff v. Wiley Rein, LLP*, 110 A.3d 561, 565 (D.C. 2015) (quotation marks omitted).

The D.C. Court of Appeals applied this widely accepted principle in *Sibley v. St. Albans School*, 134 A.3d 789 (D.C. 2016). There, the plaintiff alleged that a school's website was misleading because it stated that the school "remain[ed] committed to a policy of meeting the full demonstrated financial need of all students offered admission." *Id.* at 813. The court disagreed, explaining that it was "clear that the sentence" in question was not "a guarantee of 100% financial support to any particular student throughout the course of his years . . . but rather an aspirational statement of the goal and purpose animating a fundraising effort." *Id.*

Courts in the District of Columbia and beyond have regularly agreed that a company's statements about its goals, aspirations, and commitments—including commitments related to product sourcing—are not misleading as a matter of law. Plaintiffs have filed a number of suits involving very similar language to the "commitment" language that the plaintiff highlights here. *See St. Albans*, 134 A.3d at 813 ("For this reason, we remain committed to a policy of meeting the full demonstrated financial need of all students offered admission to our School."); *Wal-Mart Stores*, 2016 WL 4080541, at *2 n.4 ("We are committed to excellence in every aspect of our business . . . [w]e expect these same commitments to be shared by all suppliers"); *Coca-Cola*, 2022 D.C. Super. LEXIS 59, at *5 ("[C]ommitted to creating a World Without Waste"); *Barber v. Nestlé USA Inc.*, 154 F. Supp. 3d 957, 963 (C.D. Cal. 2015) ("[Nestlé] expects the Supplier to adhere to all applicable laws and regulations . . . and strive to comply with international [] industry standards and best practices."), *aff'd* 730 F. App'x 464 (9th Cir. 2018) (mem.); *XYZ Two Way Radio Serv., Inc. v. Uber Techs. Inc.*, 214 F. Supp. 3d 179, 183 (E.D.N.Y 2016) ("We believe deeply that, alongside our driver partners, we have built the safest transportation option . . . around the world.");

11

*Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 794 (10th Cir. 2016) (ethics code stated "that 'employees [] . . . must accept personal responsibility to act with the utmost integrity'").

Each of those plaintiffs likewise alleged that the statements were misleading because the companies failed in some way to achieve the commitments, goals, or aspirations that they had publicly set for themselves. *See St. Albans*, 134 A.3d at 812-13 (alleging the school did not make financial assistance available meeting the student's needs); *Wal-Mart Stores*, 2016 WL 4080541, at *3 (alleging suppliers subjected workers to unsafe conditions leading to building collapse); *Coca-Cola*, 2022 D.C. Super. LEXIS 59, at *9 (alleging Coca-Cola had "failed to meet certain environmental goals in the past"); *Barber*, 154 F. Supp. 3d at 957 (alleging that "some proportion of the [suppliers] use forced labor"); *XYZ Two Way Radio*, 214 F. Supp. 3d at 184 (alleging that Uber's safety practices were "not 'more rigorous that what is required to become a taxi driver'"); *Intermountain Stroke Ctr.*, 638 F. App'x at 794 (alleging violations of the ethics code).

Across the board, the courts held that the companies' statements about their commitments or aspirations were not misleading as a matter of law. In *Wal-Mart Stores*, for example, the same plaintiff that is bringing this suit brought a similar case against a group of retailers based in part on "aspirational" statements about their suppliers' sourcing standards, including that Wal-Mart is "committed to excellence" and "expect[s] these same commitments to be shared by all suppliers." 2016 WL 4080541, at *1-3, 6. The court held that, as a matter of law, these statements were not actionable, explaining that "[t]he usage of qualifying terms 'expect,' 'goal,' and 'ask' is demonstrative of the aspirational nature of the statements and further demonstrates that the statements are not promises to consumers." *Id.* at *6. The plaintiff's allegation that consumers might understand these statements to mean that products "will be sold child labor free or by

workers who work in a safe and healthy environment" was therefore "contrary to a fair objective reading by a reasonable consumer." *Id.*

The Superior Court recently rejected another similar suit in *Coca-Cola*. There, the plaintiff alleged that Coca-Cola's statements about its sustainability goals for plastic usage—including that it was "committed to creating a World Without Waste" and that its goal was to "make 100% of [its] packaging recyclable by 2025"—were misleading because consumers might be confused into thinking that the business had already achieved sustainability. *See* 2022 D.C. Super. LEXIS 59, at *5, 8. The court disagreed, holding that "general, aspirational, corporate ethos" statements pointing "to a general theme of sustainability and corporate improvement" "do not successfully create a claim under the CPPA." *Id.* at *6-7. In so holding, the court recognized that "[c]ourts have consistently rejected quarrels . . . with forward-looking or aspirational statements." *Id.* at *9.[10]

Courts in other jurisdictions have reached similar results.[11] The Tenth Circuit, for example, rejected a claim that a healthcare system's adoption of an ethics code would mislead a consumer into thinking that all of its personnel adhered to that code all of the time. *Intermountain Stroke Ctr.*, 638 F. App'x at 794 (rejecting a Lanham Act claim). Likewise, in *Barber*, the Central District of California held that "aspirational" statements about how Nestlé's suppliers will behave were not misleading because "no reasonable consumer" could interpret them to mean that the "suppliers comply with Nestlé's requirements in all circumstances." 154 F. Supp. 3d at 963-64. And in *XYZ Two Way Radio*, the court held that statements tending "to convey the impression that Uber takes

---

[10] An appeal of the *Coca-Cola* decision is pending. *See Earth Island Inst. v. Coca-Cola Co.*, No. 22-CV-0895 (D.C.).

[11] Because "consumer protection laws tend to share common principles across the country," *Stone v. Landis Constr. Co.*, 120 A.3d 1287, 1291 n.9 (D.C. 2015), this Court may "look[] to courts' interpretations of [other] state consumer-protection statutes in construing the CPPA." *Ctr. for Inquiry*, 283 A.3d at 118 (D.C. 2022) (citing *Saucier*, 64 A.3d at 444).

the safety of its passengers seriously" were not actionable—even if the statements were "boastful and self-congratulatory." 214 F. Supp. 3d at 184.

These principles require dismissing the suit as to the statements that form the core of the plaintiff's Complaint. The plaintiff's primary objection is that the defendant is "misrepresenting to consumers that it is 'committed to 100% ethical coffee sourcing' and to '100% ethically sourced tea' when in reality Starbucks does not ethically source [all of] its coffee beans or tea leaves." Compl. ¶ 1. The plaintiff thus relies heavily on instances where the defendant has included this language or materially identical wording on its website or on its products, including coffee bags, K-cups, and tea packaging. *See id.* ¶¶ 1, 3, 29, 41, 43, 44-47, 48. And the plaintiff explains that it believes this statement is misleading because customers would not expect such a company to have "multiple instances of forced or child labor and workplaces with rampant gender-based violence in its coffee and tea supply chains." *Id.* ¶ 51.[12]

The Court should join the judicial consensus recounted above and reject the plaintiff's CPPA claims based on the defendant's statements that it is "committed to" ethical sourcing of its coffee and tea. Allowing a suit to proceed based on this theory would undermine the values that the plaintiff purports to advance by deterring companies from publicly setting ambitious goals and being transparent about product sourcing. *See Coca-Cola*, 2022 D.C. Super. LEXIS 59, at *9 ("Rather, [the plaintiff] asserts that because Coca-Cola allegedly has failed to meet certain environmental goals in the past, it should not be allowed to set any for the future."). It makes little sense to construe the CPPA—a statute designed to ensure consumers are able to make informed

---

[12] Although the Complaint describes "gender-based violence" as "rampant," it identifies only one example. *See* Compl. ¶ 55. To be sure, to the defendant, even one example is too many—and the Complaint recognizes that the defendant *no longer sources* tea from the farm involved in that incident. *See id.*

decisions—to incentivize companies to provide *less* truthful information based on the theory that consumers might take that information and develop unreasonable and unrealistic expectations.

To the extent the plaintiff alleges that the statements are misleading because the defendant is not *genuinely* committed to 100% ethical sourcing, that is likewise insufficient to state a claim. As a legal matter, statements about aspirations and goals are not actionable because there "are no promises or measurable datapoints that would render [such] statements true or false." *Coca-Cola*, 2022 D.C. Super. LEXIS 59, at *6. They are, in other words, a species of puffery that "no reasonable consumer would rely upon" to be true. *Wal-Mart Stores*, 2016 WL 4080541, at *7; *accord XYZ Two Way Radio*, 214 F. Supp. 3d at 184. As another Judge in this District has explained, "unfulfilled . . . statements as to future events" "are not actionable because they are immaterial to reasonable people, and those who would rely on them do not act with reasonable justification." *Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99, 106 (D.D.C. 2006) (quotation marks omitted).

In any event, the plaintiff has failed to plausibly allege that the defendant is not genuinely committed to 100% ethical sourcing of its products. As the Complaint itself recognizes, the defendant has in fact adopted extensive procedures for implementing its commitment, namely C.A.F.E. Practices and the Rainforest Alliance. *See, e.g.*, Compl. ¶¶ 32-33. The plaintiff alleges that those practices could be even more stringent but, as the defendant explains *infra*, pp. 16-20, courts have consistently refused to endorse false-or-misleading advertising claims based on statements that a party has adopted a particular set of practices that the plaintiff thinks could be made even stronger. Additionally, the plaintiff does not allege that a single comparable coffee or tea retailer has implemented a more protective set of sourcing guidelines than the defendant— making it implausible that the defendant's chosen practices were adopted in bad faith. And,

although the plaintiff insinuates that the defendant does not enforce the standards as advertised, its allegations in fact fail to establish any inconsistencies. *See infra* pp. 20-22.

> **B.**     **The Defendant's Statements About its Supply Chain Practices Are Not False or Misleading.**

The plaintiff also objects to a handful of statements on the defendant's website regarding C.A.F.E. Practices and Rainforest Alliance. These statements—plucked from disparate parts of different websites and cobbled together divorced from their context—are neither false nor misleading. On the contrary, the defendant accurately represents these programs and its participation in them.

> 1.     The Defendant Accurately Represents its Verification Standards and Practices.

The defendant accurately represents that it employs C.A.F.E. Practices for coffee and sources tea from Rainforest Alliance certified farms. That much, the plaintiff does not dispute. Instead, the plaintiff's theory of deception is that these programs do not completely prevent every violation. Courts have regularly refused to allow false-or-misleading advertising claims based on similar theories. *See, e.g*, *Dwyer v. Allbirds, Inc.*, 598 F. Supp. 3d 137, 150 (S.D.N.Y. 2022) ("That Plaintiff and PETA believe that [d]efendant should use a different method of measuring the Product's carbon footprint . . . does not plausibly suggest that what [d]efendant in fact says is materially misleading."); *Herceg v. Chobani, LLC*, No. 22-CV-5137 (KMK), 2023 WL 6162939, at *5-6 (S.D.N.Y. Sept. 21, 2023) (rejecting argument that "Defendant is materially misleading consumers because there are better [verification] standards in the industry").

In *Dwyer*, for example, the plaintiff sued an apparel manufacturer under New York's CPPA analogue, challenging the defendant's environmental impact claims—such as "Sustainability Meets Style," "Lower Carbon Footprint," and "Reversing Climate Change"—because the defendant's calculation of the carbon footprint was based on methodologies that had been

criticized by PETA. 598 F. Supp. 3d at 144. The plaintiff also claimed that, because the defendant relied on a certification for its wool that only called for audits every three years and "[did] not extend to certification beyond the farm gate," its representations that its wool harvesting practices were "humane" were deceptive. *Id* at 146. Dismissing the complaint, the court held that the defendant's environmental claims based on use of third-party standards were not deceptive, because although "[t]here may well be room for improvement in the [standards] . . . that does not suggest that reliance on the current standard is deceptive." *Id*. at 151. Similarly, the plaintiff could not challenge the defendant's animal welfare claims based on "critiques of the methodology [a third-party organization] uses to certify farms," which "is not enough to render plausible the allegation that Defendant made a material misleading statement when it allegedly described its wool harvesting practices as humane." *Id.*

The plaintiff's claims here fail for the very same reasons. The plaintiff's dissatisfaction with the frequency and nature of the defendant's inspections and audits, Compl. ¶¶ 75, 77, 78, 79, are at most, "a criticism of the [program's] methodology, not a description of a false, deceptive, or misleading statement about the Product." *Dwyer*, 598 F. Supp. 3d at 149. The plaintiff's allegations are thus "not enough to render plausible the allegation that Defendant made a material[] misleading statement when it allegedly described its [sourcing] practices as [ethical]." *See id.*; *accord Herceg*, 2023 WL 6162939, at *6 (rejected claims "challenging the sufficiency of the standards of the certification, with which Defendant states they are complying").

The plaintiff also urges that the defendant misleads consumers because it fails to disclose that "many of [the defendant's] supposedly ethical suppliers have in fact relied on forced and/or child labor—that is, that C.A.F.E. Practices verification does not guarantee the absence of forced and child labor," Compl. ¶ 100; that the "Rainforest Alliance certification is frequently borne by

17

human rights abusing employers," *id,* ¶10; and that "certification programs" have "limitations as a guarantee of ethical sourcing," *id.* ¶ 106. The plaintiff also faults the defendant for not disclosing the exact "prevalence of unethical worker treatment among its certified suppliers." *Id.* ¶ 108. This theory is just another way of pressing the claim that the statements about compliance with standards are misleading because the standards are, in the plaintiff's eyes, insufficient, and fails for the same reasons.

Additionally, as the documents cited in the Complaint demonstrate, the defendant's standards and procedures are publicly available for anyone who wishes to review them and, as the plaintiff's allegations make clear, human rights and labor abuses in the coffee and tea industry's supply chains are longstanding and well-documented. *See Lizama v. H&M Hennes & Mauritz LP*, No. 4:22 CV 1170 RWS, 2023 WL 3433957, at *5 n.3 (E.D. Mo. May 12, 2023) ("[Plaintiff's] allegations fail to meet the plausibility standard in this case because H&M provides consumers with copious amounts of information about the relevant comparison [related to the plaintiff's claims]."); *Chobani*, 2023 WL 6162939, at *7 (availability of "numerous other standards, publicly available resources, and the growing chorus of worker and human rights groups working to create meaningful labor protections for dairy workers" undermined claim that the defendant improperly withheld information material to consumers) (quotation marks omitted); *Gordon v. Target Corp.*, No. 20-CV-9589 (KMK), 2022 WL 836773, at *10 (S.D.N.Y. Mar. 18, 2022) (plaintiff failed to plausibly allege that defendant improperly omitted information because, according to plaintiff, health experts had been publishing it for years). Under these circumstances, the "omissions of which [the plaintiff] complains" are "incapable of misleading a reasonable consumer. *McMullen v. Synchrony Bank*, 300 F. Supp. 3d 292, 309 (D.D.C. 2018).

Nowhere in the Complaint does the plaintiff allege that the defendant represented that a C.A.F.E. Practices verification "*guarantee*[*s*] the absence of forced and child labor," Compl. ¶ 100 (emphasis added), or that the defendant's supply chain is completely devoid of any human rights or labor concerns. On the contrary, the defendant acknowledges that labor and human rights issues remain areas of ongoing focus and improvement and explicitly recognizes that C.A.F.E. Practices "is just *one of the ways* in which [the defendant is] providing holistic support to farmers and their communities to ensure a sustainable future of coffee for all." *See* Starbucks, *Coffee*; *see also* Compl. ¶ 30 n.7 (citing Starbucks, *Global Human Rights Statement* ("Our company's pursuit of good is an ongoing effort. Aligned with this belief, we are committed to ongoing human rights due diligence and assessing and reporting our continuous improvement.")).

The plaintiff insinuates that the defendant *has* made such a guarantee in a video on the Starbucks Global Academy website, but no reasonable consumer could understand the video that way. In the video, the narrator poses the hypothetical question: "So how do we know that our coffee is ethically sourced?" He then immediately provides the answer: The defendant has developed "rigorous guidelines," and then goes on to explain the development of C.A.F.E. Practices in partnership with Conservation International. In context, no reasonable consumers would understand this to guarantee a perfect world where suppliers abide by the guidelines at all times—much less to guarantee that any particular coffee product was in fact "ethically sourced."[13] The Superior Court in *Wal-Mart Stores* rejected a similar claim, recognizing that when Wal-Mart stated that its "suppliers are contractually required to sign our Standards for Suppliers before

_____

[13] Additionally, the plaintiff highlights the narrator's statement at the end of the video: "There's a special pride that I have when I have that first sip of coffee. I know where that coffee came from. I know it was ethically sourced." These first-person statements about the narrator's own knowledge as a "green coffee buyer at Starbucks." They are not plausibly construed as statements that consumers should take as representations about all of the defendant's products—indeed, immediately after making this statement, the narrator directs viewers "interested in learning more" to "head over to StarbucksGlobalAcademy.com."

they're approved to produce merchandise," that statement could not be read as "an assurance of any kind that Wal-Mart's suppliers will comply with absolute certainty." 2016 WL 4080541, at *5-6.

Because the plaintiff cannot establish that a reasonable consumer would be misled, the CPPA claim fails as a matter of law. *See Wal-Mart Stores*, 2016 WL 4080541, at *2, 5-6 & nn.5, 9 (dismissing CPPA claim based on seller's statement that "[w]e . . . expect [our suppliers] to prohibit the use of child labor"); *see also Barber*, 154 F. Supp. 3d at 963-64 (dismissing consumer protection claim based on Nestlé's statement that its "[s]upplier[s] must under no circumstances use . . . forced labor" and holding that "no reasonable consumer . . . could conclude that Nestlé's suppliers comply with [this prohibition] in all circumstances," as the challenged documents were "replete with evidence that its requirements represent an ideal").

There is also good reason why consumer-protection statutes do not sweep as broadly as the plaintiff contends. A contrary ruling would turn the CPPA into a vehicle for courts to micromanage the specific design of an overall program to ensure ethical sourcing from third-party suppliers that are not under a company's control. The CPPA would turn into a kind of super-regulation, giving courts license to manage every aspect of a company's operations. There is no basis to believe that the D.C. Council has authorized such a remarkable backdoor to the regulatory process.

        2.      <u>The Defendant Accurately Describes its Zero-Tolerance Policy Procedures.</u>

The plaintiff also fails to state a claim based on the defendant's zero-tolerance policy. According to the plaintiff, the defendant's "failure to promptly revoke the C.A.F.E. Practices certification" of certain farms allegedly cited with labor violations "and suspend them from its ethical sourcing program" contradicts its representation about "zero tolerance" procedures. *See* Compl. ¶¶ 35, 71. This allegation mischaracterizes both the zero-tolerance policy and the

allegations in the Complaint about how the defendant responded to these serious reported violations.

The only allegation that the plaintiff includes about the terms of the zero-tolerance policy is derived from an educational module on the Starbucks Global Academy website. That site explains that "[f]arms that fail to meet the zero-tolerance indicators [compliance with minimum wage law and absence of forced or child labor] are not allowed to participate in the program until corrective action is taken and correction is confirmed." Compl. ¶ 35 & n.13 (quoting Starbucks & Ariz. State Univ., Coffee Academy 300: Module 5.9 – Social Responsibility) (alterations in Complaint). This generalized description does not discuss what procedures must occur before a farm has been deemed to "fail to meet the zero-tolerance indicators," and it does not suggest that suspending participation until corrective action occurs means permanently "revok[ing] the C.A.F.E. Practices certification" of a farm under the zero-tolerance policy, as the plaintiff contends. Compl. ¶¶ 35, 71.

The Complaint does not include any facts sufficient to show that the defendant has failed to comply with the terms of its zero-tolerance policy. For starters, the plaintiff *admits* that, in at least two cases of alleged violations, the farm no longer supplies tea or coffee to the defendant. *See* Compl. ¶ 55 (James Finlay & Co. tea farm); ¶ 68 (Cedro II in Brazil). The plaintiff can hardly maintain that this suggests a violation of the zero-tolerance policy. For other alleged labor violations in the Complaint—including those involving the Piedade and Fartura farms in Brazil— the plaintiff does not allege how the defendant reacted to the alleged violation at all. *See id.* ¶¶ 54, 67; *see also id.* ¶ 65 (unnamed farms in Brazil); *id.* ¶ 73 (unnamed farms in Guatemala).

For the remaining farms with alleged violations, the plaintiff claims that they retained their verification and/or continued to supply the defendant at some point after the violations were

discovered. *See id.* ¶ 69 (Mesas farm); ¶ 70 (Bernardes Estate).[14] But, as the defendant has explained, the zero-tolerance policy does not demand immediate, permanent expungement from the C.A.F.E. Practices program. Rather, the defendant has transparently disclosed that a zero-tolerance violation like those alleged in the Complaint would result in an immediate suspension and investigation followed by an opportunity for a farm to take corrective action to comply with C.A.F.E. Practices standards. *See* Compl. ¶ 35.

In short, because nothing supports the allegation that the defendant exercises its zero-tolerance policy "in any manner other than the one it describes in its literature," *Dwyer*, 598 F. Supp. 3d at 150, the defendant cannot base its CPPA claim on statements regarding the defendant's zero-tolerance policy. *See also Herceg*, 2023 WL 6162939, at *7 (dismissing where a plaintiff's claims about verification standards were "demonstrably false").

> 3. The Defendant's Other Statements About Ethical Sourcing Practices Are Not Misleading.

The defendant's other statements—that it is "a leader in ethical sourcing," Compl. ¶ 31, that its verification standards are "rigorous," *id.* ¶ 42, and that it offers coffee that is "good for the planet and good for the people," *id.*—also cannot state a claim under the CCPA. These statements are classic "puffery." *See Pearson*, 961 A.2d at 1076; *Freeland v. Iridium World Commc'ns*, 545 F. Supp. 2d 59, 76 (D.D.C. 2008) ("[G]eneralized statements of optimism that are not capable of objective verification are not actionable." (quotation marks omitted)); *E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 496 F. Supp. 3d 338, 401 (D.D.C. 2020) (allegations about defendant's "leadership in the fertility industry" are puffery); *Hoyte v. Yum! Brands*, Inc., 489 F. Supp. 2d 24, 30 (D.D.C. 2007) ("KFC's claims that its restaurants serve the 'best food' is a non-measurable,

---

[14] The report that plaintiff relies on to document these allegations indicates that the cited violations at Mesas had been resolved after one week. *See Behind Starbucks Coffee*, Repórter Brasil, pp. 11-12 (cited in Compl. ¶ 69 n.22).

'bald statement of superiority' that is non-actionable puffery."); *Budach v. NIBCO, Inc.*, No. 2:14-CV-04324, 2015 WL 3853298, at *7 (W.D. Mo. June 22, 2015) (defendant's advertisements promoting products as "superior quality" and "highest quality" were "subjective advertising slogans constituting non-actionable puffery") (citation and quotation marks omitted).

To the extent the plaintiff challenges the statement that C.A.F.E. Practices are "designed to" promote ethical sourcing, Compl. ¶ 32, that is likewise not actionable. Much like the statement that the defendant is "committed to" ethical sourcing, a statement about what a program is "designed to" do is too aspirational to be actionable. In other words, it amounts to nothing more than non-actionable "corporate ethos, hopes, and philosophies." *See Coca-Cola*, 2022 D.C. Super. LEXIS 59, at *11; *supra* Part I.A.

### C. The Plaintiff Cannot State a Claim Based on Statements Outside the Limitations Period.

The plaintiff's claim is also untimely as to a number of statements in the Complaint. Under the CPPA, "[a] plaintiff must bring an action . . . within three years from the time the right to maintain the action accrues"—that is, "when the plaintiff can file suit and obtain relief." *Bradford*, 249 F. Supp. 3d at 334-35 (quotation marks omitted); D.C. Code § 12-301(8). As a general rule, an action accrues upon injury or when a reasonable person knew or should have known about the injury. *Silvious v. Snapple Beverage Corp.*, 793 F. Supp. 2d 414, 419 (D.D.C. 2011) (citing *Diamond v. Davis*, 680 A.2d 364, 372 (D.C. 1996)). Because the plaintiff's Complaint was filed on January 24, 2024, any claim that accrued prior to January 2021 is time-barred.

Here, a number of the statements the plaintiff challenges as misleading or deceptive plainly occurred before January 2021. *First*, the defendant's statement "that it is committed to achieving the goal of '100%' ethically sourced tea by 2020" on its face plainly occurred sometime before 2020. Compl. ¶ 47. Second, the tweets allegedly from the defendant's social media account are

dated June and July of 2020, respectively. *Id.* ¶ 49. Third, the defendant's Global Human Rights
Statement was published in 2020. *See id.* ¶¶ 30, 34, 79.

Because all these representations were made outside the applicable statute of limitations
period, they do not support a timely CPPA claim. *See Bradford*, 249 F. Supp. 3d at 335 (CPPA
claims are time barred where "plaintiffs were aware, or should have been aware, of the defendant's
alleged misrepresentations" outside the limitations period). Even assuming that any of these
statements were actionable when made—and they were not, *see supra* pp. 10-23—they are now
time barred. The plaintiff's own allegations demonstrate that the plaintiff had access to more than
enough information before January 2021 to develop its (meritless) theory of deception. Indeed, the
Complaint refers to numerous alleged labor violations that were publicly documented before the
limitations period began, and before the statements outside the limitations period. *See, e.g.*, Compl.
¶ 63 ("For nearly *ten years*, investigations by government officials and journalists in major coffee
growing regions have uncovered numerous labor and human rights violations on coffee farms that
have been certified by Starbucks' own monitoring program. (emphasis added)); *id.* ¶ 65 (describing
Brazilian labor inspections "in summer 2015"); *id.* ¶ 66 (describing Brazilian labor inspections in
"summer 2018"); *id.* ¶ 73 (discussing "a 2020 report from the United Kingdom's Channel 4
*Dispatches* program" about "C.A.F.E. Practices certified coffee farms in Guatemala"); *id.* ¶ 75 &
n.25 (relying on a 2016 report to claim that "annual inspections are recognized as inadequate to
ensure that workers on plantations and large farms"); *id.* ¶ 84 ("deficiencies in Rainforest Alliance
certification's ability . . . have also been consistently documented for *over ten years*"); *id.* ¶ 85
("As early as 2011, [a] Dutch public benefit organization and research institute . . . reported on
endemic labor violations at several Kenyan and Indian tea plantations certified by Rainforest
Alliance."); *id.* ¶ 86 (describing a 2015 "joint investigation of working conditions at Rainforest

Alliance-certified tea plantations in Assam, India"); *id.* ¶ 94 (describing a 2016 report that purportedly "detailed the widespread failure of coffee certification systems, including Starbucks' C.A.F.E. Practices, to protect Brazilian coffee workers"); *id.* ¶ 95 & n.35 (citing a 2020 report regarding Guatemalan C.A.F.E. Practices farms); *id.* ¶ 100 (relying on a 2016 press release to allege that "Starbucks misleadingly fails to disclose facts material to consumer purchasing decisions").

In short, before the limitations period, both the pre-2021 statements and the information needed to reveal that they were allegedly misleading were readily available to the plaintiff. Tellingly, the plaintiff—a sophisticated organization that purports to engage in labor advocacy as its business—does not even attempt to suggest that it would not have been aware of this information before the limitations period, much less that it was unavailable. Accordingly, the plaintiff cannot rely on any statements in the Complaint that pre-date 2021 to state a claim.

## II.   Imposing Liability for Statements About the Defendant's Commitments and Corporate Responsibility Would Violate the First Amendment.

The plaintiff's allegations about the defendant's statements on the Starbucks Global Academy and other websites suffer from another fatal flaw: They are an invitation to improper viewpoint discrimination under the First Amendment. If the Court accepts the plaintiff's expansive reading of the CPPA, then it should still reject the plaintiff's claims as to these statements.

### A.   The First Amendment Protects Corporate Speech on Matters of Public Importance.

The First Amendment prohibits state laws from abridging speech, and "[i]n the ordinary case it is all but dispositive to conclude that a law" regulating speech "is content based and, in practice, viewpoint discriminatory." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011). Strict scrutiny generally applies, and few laws can satisfy that demanding test. *See id.* at 565, 571. A less

demanding—though far from toothless—First Amendment standard governs speech that qualifies as "commercial." *Id.* at 579.

Not all speech by a for-profit corporation is "commercial," however. Even as a corporate speaker, the defendant enjoys the full protection of the First Amendment when it "editorialize[s] on any subject, cultural, philosophical, or political." *Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 760-61 (1976); *accord First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784 (1978); *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of California.*, 475 U.S. 1, 8-9 (1986) (plurality op.). Full First Amendment protections also apply to corporate statements that "report any newsworthy fact, or . . . make generalized observations even about commercial matters." *Virginia Bd. of Pharm.*, 425 U.S. at 761. Even where corporate speech advances a product or service, the speech does not "retain[] its commercial character when it is inextricably intertwined with otherwise fully protected speech." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988). These rules reflect that "[c]orporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Pac. Gas*, 475 U.S. at 8 (plurality op.) (quoting *Bellotti*, 435 U.S. at 783); *see also Thornhill v. Alabama*, 310 U.S. 88, 103 (1940) ("Free discussion concerning the conditions in industry . . . appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society.").

In *Bolger v. Youngs Drug Products Corp.*, the Supreme Court articulated a three-factor test for determining whether speech that does more than merely "propose a commercial transaction" is subject to full protection or the more limited protections due to commercial speech. 463 U.S. 60, 66 (1983) (quoting *Virginia Bd. of Pharm.*, 425 U.S. at 762). The Court looked to three factors to

determine whether speech was "commercial": (1) whether it takes the form of an advertisement; (2) whether it includes "reference to a specific product"; and (3) whether the speaker has an "economic motivation." *Id.* at 66-67. Under *Bolger*, companies generally retain "the full panoply of protections" when speaking outside "the context of commercial transactions." *Id.* at 68.

Three years after *Bolger* in *Pacific Gas*, the Court addressed the degree of First Amendment protection for corporate speech unrelated to a specific product or transaction. For many years, Pacific Gas and Electric Company had distributed its own newsletter, called *Progress*, in mailings alongside bill statements. *Pac. Gas*, 475 U.S. at 5. *Progress* included "political editorials, feature stories on matters of public interest, tips on energy conservation, and straightforward information about utility services and bills." *Id.* Litigation began when the California Public Utilities Commission ruled that envelope space in utility mailings belonged to consumers and ordered Pacific Gas to mail a third-party newsletter as well. Justice Powell wrote for the plurality that the *Progress* newsletter was entitled to "the full protection of the First Amendment." *Id.* at 8. Forced publication of content alongside the newsletter was therefore "antithetical to the free discussion that the First Amendment seeks to foster." *Id.* at 16.

Like commentary on matters of public concern, courts grant significant protections to studies and academic work because "academic freedom is 'a special concern of the First Amendment.'" *ONY, Inc. v. Cornerstone Therapeutics*, 720 F.3d 490, 496 (2d Cir. 2013) (quoting *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967)); *see also Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994) ("More papers, more discussion, better data, and more satisfactory models—not larger awards of damages—mark the path toward superior understanding of the world around us.").

Content-based discrimination against fully protected speech triggers strict scrutiny—even for a corporate speaker speaking on matters of public importance within the corporation's industry. *See Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). Laws subject to strict scrutiny must "be narrowly tailored to promote a compelling Government interest." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000).

**B.      The Defendant's Online Statements Are Not Commercial Speech.**

The online statements targeted by the plaintiff are neither misleading nor commercial speech. Rather, these statements communicate the defendant's general corporate philosophy as a major coffee distributor in a massive global supply chain. Even assuming these statements have some underlying commercial motivation, the online statements are "inextricably intertwined" with statements on matters of public concern, namely supply chain ethics. *Riley*, 487 U.S. at 796; s*ee Thornhill*, 310 U.S. at 103. Regulation targeting these statements therefore triggers strict scrutiny, and the plaintiff cannot meet that exceedingly high bar.

1.      Starbucks Global Academy

The Starbucks Global Academy online course platform, offered in partnership with Arizona State University, outlines in general terms the statements that the defendant takes to ensure compliance with ethical norms. Compl. ¶ 35; *see* Starbucks & Ariz. State Univ., *About Starbucks Global Academy*. The statements on this site are not entitled to the lesser protections accorded commercial speech because they do far "more than propose a commercial transaction"—they communicate the defendant's views on important issues. *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 523 n.12 (D.C. Cir. 2015). Starbucks Global Academy courses are not plausibly an advertisement. Rather, the defendant maintains Starbucks Global Academy in coordination with Arizona State University to train and educate current and prospective employees and the general public. It is maintained on an entirely separate website from the defendant's commercial website,

and users do not need to pay any fee to access its educational content. Once logged onto the platform, users can access a broad spectrum of courses, including classes on workplace inclusivity, conflict resolution, and the coffee industry. *See Pac. Gas*, 475 U.S. at 5 (providing full First Amendment protections to newsletter incorporating "political editorials, feature stories on matters of public interest, tips on energy conservation, and straightforward information about utility services").

This kind of speech enjoys the First Amendment's full protection. As part of an online course platform provided in partnership with Arizona State University, Starbucks Global Academy content falls well within the zone of "special concern" for academic freedom. *Keyishian*, 385 U.S. at 603. The defendant has a First Amendment prerogative to speak about its industry, mission and initiatives. Coextensive with that prerogative is a right to design and advocate a company model for achieving ethical sourcing initiatives.

2.      The Defendant's Website and Social Media Accounts

The plaintiff also alleges that statements on the defendant's website and social media platforms mislead consumers. The plaintiff takes particular issue with (1) the defendant's Global Human Rights Statement; (2) statements on Starbucks.com concerning the ethical sourcing of sustainable coffee and tea; and (3) two 2020 posts on the defendant's X (Twitter) profile. Again, these statements fail the baseline test for commercial speech because they are not proposing a commercial transaction. *See Virginia Bd. of Pharm.*, 425 U.S. at 761 (describing commercial speech along the lines of "I will sell you the X [product] at the Y price."). These statements thus qualify as fully protected speech under *Bolger* for two reasons. First, none of the online statements reference any product other than coffee and tea in the most general sense. Second, they are not advertisements. Over the course of several thousand words, the Global Human Rights Statement informs the reader about the defendant's practices as a coffee supplier, business partner, and

employer. *See* Starbucks, *Global Human Rights Statement* (cited in Compl. ¶ 30 n.7). Nowhere does the statement propose a transaction or provide a link to an online marketplace. Similarly, Starbucks.com webpages detailing coffee and tea sourcing limit discussion to the defendant's social responsibility and sourcing standards. Finally, the 2020 X posts referenced in the Complaint merely state the Company's position against forced labor generally. Compl. ¶ 49.[15]

Beyond lauding the company's policies and initiatives, these online statements advance the defendant's perspectives on what constitutes ethical coffee and tea sourcing. These statements contribute to a broader discussion of ethical and sustainable practices in the defendant's industry. Deeming these statements—so divorced from the sale of specific products—minimally protected commercial speech fails to appreciate their contribution to the "discussion, debate, and the dissemination of information and ideas." *Pac. Gas.*, 475 U.S. at 8. Penalizing these statements, moreover, would impermissibly chill corporate speech on the subject of its own industry. *See Thornhill*, 310 U.S. at 103 ("Free discussion concerning the conditions in industry . . . appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society.").

## C.     The Plaintiff's Construction of the CPPA Cannot Withstand Strict Scrutiny

As non-commercial speech, the statements on the defendant's websites are not actionable under the First Amendment. The plaintiff's construction of the CPPA subjects the defendant's speech to civil liability on the basis of content and viewpoint. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) ("[A] law is content-based if a regulation of speech on its face draws distinctions based on the message a speaker conveys." (quotation marks omitted)). As a result, the CPPA would be subject to strict scrutiny. *Playboy*, 529 U.S. at 813. The plaintiff cannot

---

[15] The Global Human Rights Statement and X posts are also time-barred. *Supra* pp. 23-25.

plausibly argue that the CPPA is narrowly tailored to serve any important governmental interest. From a practical perspective, the plaintiff's construction of the CPPA would prevent corporate entities from discussing their future goals and matters of public policy related to the industry. The defendant has a right to engage in these dialogues. *Bellotti*, 435 U.S. at 784-85 ("In the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue.").

At a minimum, these constitutional concerns provide an additional reason to read the CPPA not to reach the statements in the Complaint. *See Ass'n of Priv. Sector Coll. & Univ. v. Duncan,* 681 F.3d 427, 454 (D.C. Cir. 2012) ("[A] law must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.") (quotation marks omitted). Courts have long read consumer protection statutes to coexist with corporate speech. *See Virginia Bd. of Pharm.*, 425 U.S. at 761-62. This Court should do the same.

## CONCLUSION

For all the foregoing reasons, the defendant respectfully requests that the Court dismiss the

Complaint under Rule 12(b)(6).

Dated: April 5, 2024

Respectfully submitted,

/s/ Karl A. Racine
Karl A. Racine (D.C. Bar No. 431534)
David M. Foster (D.C. Bar No.497981)
Carolyn A. DeLone (D.C. Bar No. 1004476)
Jay Jones (D.C. Bar No. 90008076)
Reedy C. Swanson (D.C. Bar No. 230795)
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
karl.racine@hoganlovells.com
david.foster@hoganlovells.com
carrie.delone@hoganlovells.com
jay.jones@hoganlovells.com
reedy.swanson@hoganlovells.com

*Attorneys for Starbucks Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2024, I caused a true and correct copy of this filing to be electronically filed with the Clerk of the Court using CM/ECF. I certify that all counsel of record in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>/s/ Karl A. Racine</u>
Karl A. Racine